**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALEJANDRO VELAZQUEZ, *Plaintiff-Appellant*, <br><br> v. <br><br> CITY OF LONG BEACH; LONG BEACH POLICE DEPARTMENT; KALID ABUHADWAN, Officer, in his individual and official capacity; MARTIN RON, Officer, in his individual and official capacity, *Defendants-Appellees*. | No. 12-56933 <br><br> D.C. No. 2:11-cv-00120-R-JEM <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
December 9, 2014—Pasadena, California

Filed July 15, 2015

Before: Kim McLane Wardlaw and Marsha S. Berzon,
Circuit Judges and William E. Smith,[*] District Judge.

Opinion by Judge Berzon

---

[*] The Honorable William E. Smith, Chief District Judge for the U.S. District Court for the District of Rhode Island, sitting by designation.

**SUMMARY**[**]

**Civil Rights**

The panel reversed the district court's judgment, entered following a jury verdict, and remanded for a new trial in an action brought pursuant to 42 U.S.C. § 1983, in which plaintiff alleged that he was unlawfully arrested for resisting a police officer, in violation of California Penal Code Section 148(a)(1), and that excessive force was used during his arrest.

Reversing the district court's grant of judgment as a matter of law on plaintiff's unlawful arrest claim, the panel held that there was sufficient evidence at trial on which a reasonable jury could have concluded that no probable cause for the arrest existed, based both on evidence that plaintiff did not in fact resist the police officer and evidence that plaintiff did not impede the police officer in the exercise of his lawful duties.

Reversing the jury's verdict on the excessive force claim, the panel held that the district court's grant of judgment as a matter of law on the lawfulness of the arrest, in conjunction with the district court's instructions on the excessive force claim, improperly influenced the jury's consideration of the excessive force claim.

The panel held that the district court's categorical exclusion of evidence relevant to establishing plaintiff's theory of municipal liability was an abuse of discretion and

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that this incorrect evidentiary ruling resulted in the district court erroneously entering judgment as a matter of law for the defendants. The panel therefore reversed the district court's grant of judgment as a matter of law on the claims against the City of Long Beach and Long Beach Police Department, brought under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Finally, the panel held that the district court erred by dismissing plaintiff's state law claims. On remand, the panel instructed the Chief Judge for the Central District of California to reassign this case to a different district judge.

## COUNSEL

Mitchell Keiter, Beverly Hills, California, for Plaintiff-Appellant.

Howard D. Russell (argued), Deputy City Attorney; Charles Parkin, City Attorney, Long Beach, California, for Defendants-Appellees.

**OPINION**

BERZON, Circuit Judge:

Alejandro Velazquez was arrested in front of his home in Long Beach, California, for violating California Penal Code § 148, which prohibits resisting or obstructing a police officer. In making the arrest, a Long Beach police officer struck Velazquez with a police baton about eleven times, injuring him. No charges relating to this incident were ever brought against Velazquez.

Velazquez sued the city of Long Beach ("the City") and several police officers (collectively, the "Officers") under 42 U.S.C. § 1983 and California law, contending that he was, among other things, unlawfully arrested and subjected to excessive force. The case went to trial. After the parties finished putting on evidence, the district court granted the City's and the Officers' Rule 50(a) motion for judgment as a matter of law as to Velazquez's § 1983 unlawful arrest and municipal liability claims. The district court then dismissed Velazquez's state law claims without prejudice. Velazquez's excessive force claim went to the jury, which returned a defense verdict.

We conclude that the district court incorrectly applied the Rule 50(a) standard, erroneously excluded relevant *Monell* evidence, and improperly dismissed the state law claims. The district court's grant of judgment as a matter of law on the unlawful arrest claim so substantially affected the jury's verdict on the excessive force claim as to require its reversal. Consequently, we reverse and remand for a new trial on all of Velazquez's claims.

## I. Background

### A. The Incident

On the afternoon of October 24, 2009, Alejandro Velazquez's girlfriend took him to a restaurant for lunch to celebrate his birthday. During lunch, Velazquez consumed two or three mixed alcoholic drinks. Lunch over, Velazquez returned to his home — he lived with his mother — to "hang out" with some friends. Velazquez and his friends remained at the home from late that afternoon through the early morning, during which Velazquez drank some more — several beers or mixed drinks.

At approximately 3:30 AM on October 25, 2009, Long Beach Police Department Officers Kalid Abuhadwan and Martin Ron received a call regarding a disturbance at Velazquez's home. The officers were informed that there was a group of eight to ten individuals "drinking [and] being loud [that] came from a party across the street, possibly," and that "the calling party just wanted them moved along and checked out." The officers were aware that an "advisal call" regarding the same group had come over the radio some time earlier that morning, meaning that group had been advised regarding a disturbance but not cited for any crimes.

The officers drove to the scene to "[t]ell the group to go inside." From that point on, the parties' accounts of the events diverge considerably.

### 1. Abuhadwan's version

When the officers arrived at the scene, they saw about eight to ten Hispanic individuals, including Velazquez,

standing around a vehicle on a "dimly lit street." Some in the group were holding beer cans. According to Abuhadwan, the officers had no intention of arresting anyone, as the problem was "something [that] easily could be avoided by just going inside and turn[ing] off the music."

Abuhadwan saw Velazquez, who was not holding a drink, leaning against a vehicle and "holding on to [it] with both of his hands." Abuhadwan testified that to him, Velazquez's position indicated that he "was possibly under the influence to the extent he couldn't hold his own balance." At the same time, Abuhadwan did not believe that Velazquez appeared "unable to care for himself." As the officers arrived in their patrol car, Abuhadwan told the group to "go inside, pick up your trash," and move a car blocking the street. Members of the group began to do as told.

In response to the officer's instructions, Velazquez said "yeah, sure" while shaking his head left to right. Abuhadwan interpreted this statement "as being sarcastic and telling the group we're not leaving, like, yeah, sure, move on, cop." Abuhadwan "ma[d]e a decision to detain" Velazquez because "he was the only subject that refused to comply with the orders." Abuhadwan left his vehicle and approached Velazquez. From about four feet away, Abuhadwan smelled alcohol on Velazquez's breath and observed that his eyes were watery.

Abuhadwan then commanded Velazquez to place his hands behind his head so he could conduct a "cursory" search, telling Velazquez that he was "being detained for [being] drunk in public." According to Abuhadwan, Velazquez replied "fuck off, I'm good." Abuhadwan repeated his command, to which Velazquez replied, "I ain't

doing that. We don't got to leave." Abuhadwan then decided to "apply a twist lock" to Velazquez.[1] Velazquez did not fight back. Abuhadwan testified that, at that point, Velazquez was not under arrest, but was "being detained."

After placing Velazquez in the twist lock, Abuhadwan began to walk Velazquez to the patrol car. While walking back to the vehicle, Abuhadwan felt Velazquez "sort of pull[] away." Abuhadwan executed an "arm bar takedown,"[2] which brought Velazquez to the ground. A "textbook" arm bar takedown places the detainee in the "prone position," with his stomach to the ground, allowing the officer more control. When Abuhadwan performed the takedown on Velazquez, however, Velazquez "roll[ed] on his back and was facing" Abuhadwan, with his fists clenched to his chest. Velazquez's legs were up in the air in a bicycle position, suggesting to Abuhadwan that Velazquez was "ready to ground fight with me."[3] Abuhadwan thereupon decided to arrest Velazquez

---

[1] Abuhadwan described a "twist lock" as "grab[bing] the left arm [of the subject] with your right hand, you C-clamp the back of the elbow to prevent a subject from elbowing you in the face, and with your left hand you grab the wrist in a C-lock motion . . . not to inflict pain, but to give . . . the officer advantage and keep the subject off balance."

[2] Abuhadwan described an "arm bar takedown" as follows: "I maintain control with my left hand and with my right hand I could either go over the shoulder and push force downward; that causes the subject to go towards the ground, or I use the edge of my hand and I apply force to the elbow, which causes a pain arrow to the elbow to make the subject go whatever direction you want."

[3] The police report Abuhadwan filed after the incident did not mention that Velazquez had an aggressive bicycle stance, or that his legs were off the ground.

"[f]or resisting, obstructing, [or] delaying a police officer," in violation of California Penal Code Section 148(a)(1).

Abuhadwan commanded Velazquez to roll over onto his stomach and to place his hands to his sides. Velazquez did not comply. Without warning, Abuhadwan struck him three times on the shoulder with his baton, commanding Velazquez again to roll over. With interspersed commands to roll over, Abuhadwan proceeded to strike Velazquez eight more times, hitting Velazquez's shoulder, lower back and buttocks area, left bicep, and hands (which were clenched to his chest). When Velazquez did begin to roll over during the strikes, Abuhadwan feared "he was going to get up onto his feet," so he continued the baton strikes, "swing[ing] at full force the entire time." While Velazquez was being struck with the baton, he shouted "leave me the fuck alone."

After eleven baton strikes, Velazquez rolled onto his stomach and placed his hands to his side; Abuhadwan then handcuffed him. Abuhadwan observed no injuries to Velazquez. Once other police units arrived at the scene, Abuhadwan lifted Velazquez from the ground, placed him under arrest, and drove him to the police station to be booked.

## 2.  Other witnesses' version

Velazquez and other witnesses recalled a starkly different series of events.

According to them, no one was drinking on the street at the time the police arrived, and there were no beer bottles or

cans present.**[4]**  Dennis Torres Magana, Velazquez's nephew who was at the scene, testified that, after the officers had pulled up in their police car, he told Abuhadwan, "Don't worry.  We're leaving, Officer."  Velazquez, who had been speaking to his mother, Elvira Hernandez, then asked Magana and the officers, "what's up?"  Velazquez recalled a similar interchange — according to him, he asked the officers, "what's going on?"

Abuhadwan appeared to be driving away when Velazquez asked his question, but he "stopped the car, put it in reverse, came back" and asked what Velazquez had said.  Velazquez replied, "I said, 'what's up.'"  The officers then got out of the car, and Abuhadwan started "speed walking towards" Velazquez.  Magana heard Abuhadwan say, "I'm tired of people calling because of you, mother fuckers."**[5]**  Abuhadwan then, according to Magana, grabbed Velazquez and "threw him to the ground."  Magana testified that Velazquez offered "no resistance" when Abuhadwan grabbed him.  Velazquez similarly testified that Abuhadwan "walk[ed] up to [him]," "grab[bed] him," and "threw [him] to the ground."

According to Velazquez and Magana, Abuhadwan as he approached did not tell Velazquez to put his hands behind his head.  Officer Ron, who was approximately four to ten feet away, also testified that he did not hear Abuhadwan issue any such order.  Several witnesses at trial, including Ron, testified that they did not recall Velazquez telling Abuhadwan to "fuck

---

**[4]** No photographs were taken, nor was any evidence collected, at the scene of the incident.

**[5]** Abuhadwan disputed that he made such a statement.

off"; indeed, Ron testified that he did not hear Velazquez utter any profanities during the "entire altercation."

After being taken down to the ground, Velazquez did not hear Abuhadwan tell him to roll over or issue any other commands. Magana testified that Abuhadwan did not give Velazquez an opportunity to roll over onto his stomach before striking him with the baton. Several witnesses stated that while being struck on the ground, Velazquez told Abuhadwan several times, "I'm not about violence"; Abuhadwan disputed that Velazquez said that. Witnesses also testified that after Velazquez rolled over, Abuhadwan continued to strike him. According to Velazquez's mother, Velazquez was bleeding from the side of his face as he was taken to the patrol car.

## 3.  Subsequent events

At the police station, Velazquez agreed to a breathalyzer test. The breath sample came back with a blood alcohol content (BAC) level of 0.15.[6]

While at the station, Abuhadwan and Ron noticed that Velazquez had been injured. A nurse at the station advised that Velazquez should be taken to a hospital for treatment. Abuhadwan, Ron, and their supervisor, Sergeant Mauk, then transported Velazquez to the hospital. There was evidence

---

[6] California's public intoxication statute provides: "[E]very person . . . [w]ho is found in any public place under the influence of intoxicating liquor . . . in a condition that he or she is unable to exercise care for his or her own safety or the safety of others [is guilty of a misdemeanor]." Cal. Penal Code § 647(f). Although Abuhadwan testified that, as a matter of Long Beach police policy, a person must have a BAC level of at least 0.15 or 0.16 to be charged with public intoxication, the Penal Code specifies no BAC level for the public intoxication offense.

that Velazquez was indeed injured.  He needed surgery for injuries to his finger and sutures on his ear.  In addition, Velazquez experienced significant bruising on his arms, chest, and shoulder areas, as well as, he testified, "intense" pain throughout his body.

Velazquez was discharged from police custody after he left the hospital.  He was never charged for any offense in connection with the incident.

## B.  The Lawsuit

Velazquez sued Abuhadwan and Ron under 42 U.S.C. § 1983, alleging that the Officers unlawfully arrested him and used excessive force against him in violation of the Fourth Amendment.  Velazquez also sued the City and Long Beach Police Department under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging, among other things, that the City "maintained a policy, pattern, practice and custom of permitting, encouraging, and ratifying the use of unnecessary and unreasonable force" by police officers, and that the City "fail[ed] and refus[ed] to investigate or discipline police officers known to have repeatedly violated the constitutional rights of suspects."  In addition to the federal civil rights claims, Velazquez brought state law claims of negligence, intentional infliction of emotional distress, assault and battery, and false arrest.

Before trial, each side filed several motions *in limine*.  As relevant here, the defendants filed a motion to preclude any reference to complaints, internal affairs history, and discipline concerning the Officers.  The district court reserved consideration of all the motions *in limine* until trial.  On the first day of trial, the district court granted the motion to

preclude reference to officer complaints, discipline, and internal affairs history.

After the close of evidence, the City and Officers filed a Rule 50(a) motion for judgment as a matter of law on Velazquez's federal claims. The City argued that there was insufficient evidence to find for Velazquez on his *Monell* claims. As to Velazquez's "Fourth Amendment [unlawful arrest] claim,"[7] the Officers contended that "the evidence is that Mr. Velazquez refused to comply with the officers' commands; that Mr. Velazquez, in response to the officers' commands not only failed to comply, but he resisted by pulling away from the officer." These actions, the Officers contended, created probable cause that Velazquez had committed a misdemeanor, in violation of California Penal Code Section 148(a)(1),[8] in the presence of the officers. In addition, the Officers claimed that Abuhadwan had "reasonable suspicion to detain Mr. Velazquez to investigate the possible crime of public intoxication," that is, a violation of California Penal Code Section 647(f). Thus, the Officers maintained, "a reasonable juror would not be able to find by a preponderance for the plaintiff on [the unlawful arrest] claim."

The district court granted the Rule 50(a) motion as to the § 1983 *Monell* and unlawful arrest claims. The district court

---

[7] Although the Complaint alleges the § 1983 excessive force and unlawful arrest claims in a single count, both parties analyzed the claims separately. So do we.

[8] Section 148(a)(1) provides that, "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, . . . shall be [guilty of a misdemeanor]." Cal. Penal Code § 148(a)(1).

did not explain the rationale for its grant of judgment as a matter of law as to the *Monell* claims. As to the unlawful arrest claim, the district court found "that there's evidence that [Velazquez] refused to do what the officer asked him to do." When Velazquez's counsel noted that there had been testimony from several witnesses that no commands were given, the court responded that "[t]here's no evidence of that at all." "The fact that witnesses testified that they didn't hear [Abuhadwan] give any instructions to Mr. Velazquez," the district court further stated, "doesn't mean that it wasn't done [—] [t]hat doesn't defeat the evidence that was given in the [matter]." The district court also commented on the credibility of Velazquez's testimony: "[Velazquez's] testimony was not all that great either, because it was I don't remember, I don't remember. . . . [Velazquez] is not too good at remembering things."

The district court then dismissed Velazquez's state law claims without prejudice, finding there to be a "problem of instructing differently for State claims of excessive force and 1983 excessive force." The district court reserved the § 1983 excessive force claim and submitted it to the jury, which returned a defense verdict. Velazquez appeals the final judgment.[9]

## II. Analysis

We review the district court's grant of a motion for judgment as a matter of law de novo. *See Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013). A district

---

[9] The issue of qualified immunity did not factor into the district court's decision, and the Officers do not contend on appeal that they are entitled to qualified immunity as to any of Velazquez's claims.

court's evidentiary rulings are reviewed for abuse of discretion and the district court will be reversed on the basis of an erroneous evidentiary ruling only if any error was prejudicial. *See C.B. v. City of Sonora*, 769 F.3d 1005, 1021 (9th Cir. 2014) (en banc). Likewise, we "review the district court's refusal to exercise supplemental jurisdiction for an abuse of discretion." *San Pedro Hotel Co. v. City of L.A.*, 159 F.3d 470, 478 (9th Cir. 1998).

### A. § 1983 Unlawful Arrest Claim

The district court ruled that a reasonable jury could not have found that Abuhadwan lacked probable cause to arrest Velazquez for resisting a police officer, in violation of California Penal Code Section 148(a)(1). Applying the proper legal standard, however, there was certainly sufficient evidence at trial on which a reasonable jury could have concluded that no probable cause existed, based both on evidence that Velazquez did not in fact resist Abuhadwan and evidence that Velazquez did not impede Abuhadwan in the exercise of his *lawful* duties, a requirement under the California misdemeanor prohibiting resisting a police officer. In concluding otherwise, the district court "improperly weighed evidence favorable to [Velazquez] against other evidence presented at trial and failed to draw all reasonable inferences in [Velazquez's] favor." *Krechman*, 723 F.3d at 1110. We therefore reverse the grant of judgment as a matter of law on Velazquez's unlawful arrest claim.

### 1.  Legal Principles

**(i)** A motion for judgment as a matter of law may be granted if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party

on that issue," Fed. R. Civ. P. 50(a), — that is, "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Conversely, "[i]f reasonable minds could differ as to the import of the evidence, . . . a verdict should not be directed." *Id.* at 250–51. When deciding whether to grant a Rule 50(a) motion, "[t]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Krechman*, 723 F.3d at 1110.

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012) (quoting *Dubner v. City & Cnty. of S.F.*, 266 F.3d 959, 964 (9th Cir. 2001)). "Probable cause exists when there is a fair probability or substantial chance of criminal activity." *United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004). "[T]he determination of probable cause is based upon the totality of the circumstances known to the officers at the time" of the arrest. *Id.*

**(ii)** In analyzing whether a reasonable jury could have found a lack of probable cause to arrest, we look to the asserted crime for which the arrest took place. The elements of the asserted crime at issue here, a Section 148(a)(1) violation, are: "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance

of his or her duties." *Garcia v. Superior Court*, 177 Cal. App. 4th 803, 818 (2009) (internal quotation marks omitted). Notably, "[f]or a § 148(a)(1) conviction to be valid, a criminal defendant must have 'resist[ed], delay[ed], or obstruct[ed]' a police officer in the *lawful* exercise of his duties." *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005) (en banc) (alterations in original). "The longstanding rule in California . . . is that a defendant cannot be convicted of an offense against a peace officer '*engaged in . . . the performance of* . . . [his or her] *duties*' unless the officer was acting lawfully at the time the offense against the officer was committed." *In re Manuel G.*, 16 Cal. 4th 805, 815 (1997) (alteration in original) (quoting *People v. Gonzalez*, 51 Cal.3d 1179, 1217 (1990)). Consequently, "Section 148(a) does not make it a crime . . . to resist unlawful orders." *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013). And, for the purposes of Section 148(a), "an officer is not lawfully performing her duties when she detains an individual without reasonable suspicion or arrests an individual without probable cause." *Garcia*, 177 Cal. App. 4th at 819 (emphasis omitted).

In *Johnson v. Bay Area Rapid Transit District*, 724 F.3d 1159 (9th Cir. 2013), for instance, a defendant police officer argued that the district court incorrectly denied him qualified immunity for arresting plaintiff Greer. More specifically, he "contend[ed] he had probable cause to arrest Greer for impeding him in the performance of his duties — a violation of California Penal Code § 148 — because by returning to the train, Greer evaded [the officer's] attempt to detain and question the entire group of young men." 724 F.3d at 1178. The district court had found that because the officer "lacked both 'probable cause to believe that plaintiffs had committed any underlying criminal violation,' and 'reasonable suspicion

to detain plaintiffs for investigatory purposes,'" the officer "also lacked probable cause to arrest Greer for violating section 148." *Id.* We affirmed, observing that "[a] suspect cannot be arrested for violating section 148 because he evaded an officer's attempt to arrest him unlawfully." *Id.* Where police officers "ha[ve] no lawful basis for stopping" an individual, we held, they "ha[ve] no lawful basis to pursue and arrest [that individual] for not acceding to the investigatory stop." *Id.*

**(iii)** Additionally, "Ninth Circuit law . . . clearly establishes the right verbally to challenge the police," and "verbal protests [cannot] support an arrest under § 148." *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995); *see also Johnson*, 724 F.3d at 1174; *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990). Likewise, "California law . . . gives citizens considerable latitude in confronting the police." *Mackinney*, 69 F.3d at 1007 (citing *People v. Wetzel*, 11 Cal. 3d 104, 107–09 (1974)). Furthermore, Section 148 does not "criminalize[] a person's failure to respond with alacrity to police orders." *People v. Quiroga*, 16 Cal. App. 4th 961, 966 (1993); *see also Mackinney*, 69 F.3d at 1008 (holding that plaintiff's "refus[al] to comply for a matter of seconds" with police officers' "order[] to stop writing on the sidewalk" was not a violation of Section 148).

*Duran v. City of Douglas* is particularly illuminating in this regard. In *Duran*, defendant Officer Aguilar was "dispatched to a downtown hotel in response to a bartender's complaints about an unruly patron," plaintiff Duran. 904 F.2d at 1374. Duran, who was intoxicated and threatening the bartender, "exchanged a few heated words" with Aguilar and then left the bar in a car driven by his wife.

*Id.* "Soon thereafter, while out on patrol, Aguilar observed a car with a passenger [Duran] who was directing an obscene gesture toward him through an open window." *Id.* Aguilar followed the car and initiated a traffic stop; when Aguilar then ordered Duran to step away from the car, Duran replied "I don't have to." *Id.* In response to Aguilar's explanation that he had stopped Duran "to find out why [he] had yelled profanities and made an obscene gesture," Duran uttered "further profanities." *Id.* at 1375. Aguilar then decided to arrest Duran for disorderly conduct. Duran brought a § 1983 action for damages resulting from the alleged unlawful stop and arrest against Aguilar.

The district court granted him partial summary judgment, and we affirmed. Noting that "police [may] not interfere with the freedom of private persons unless it be for specific, legitimate reasons," *Duran* found any such reasons to be "[m]issing from the record." *Id.* at 1376–77. That Duran "was making obscene gestures toward [Aguilar] and yelling profanities," we explained, "was not illegal," as "criticism of the police is not a crime." *Id.* at 1377 (citing *Houston v. Hill*, 482 U.S. 451, 461–63 (1987)). Nor, we held, did Duran's verbal conduct "constitute[] disorderly conduct or a disturbing of the peace"; Duran was traveling "late at night on a deserted road," and there was no evidence "that he had committed or was about to commit any other illegal act." *Id.* We thus held that "the stop and detention was illegal." *Id.*

Furthermore, we observed that the "possible motive" for Duran's detention was "retaliation for the insult [Aguilar] received from Duran." *Id.* at 1377–78. But this motive is "one upon which law enforcement officers may not legitimately rely," as it "would constitute a serious First Amendment violation." *Id.* "While police . . . may resent

having obscene words and gestures directed at them," we explained, "they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Id.* at 1378. Indeed, an "expression of disapproval toward a police officer . . . f[alls] squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech — such as stopping or hassling the speaker — is categorically prohibited by the Constitution." *Id.*

The district court's Rule 50 ruling cannot be squared with these governing principles, either procedurally or substantively.

## 2.  The District Court's Procedurally Improper Rule 50 Analysis

The district court noted, first, that "there's evidence that the plaintiff refused to do what the officer asked him to do," further explaining that Velazquez was "impeding the actions of the officers in trying to disperse [the] crowd, and that's it." There was indeed testimony as to the first point — principally, that of Abuhadwan himself.  Whether there was actually evidence on the second point, impeding the officers in their attempt to disperse the crowd, is debatable.  But whether there was or was not doesn't matter.  Velazquez indisputably presented significant evidence at trial tending to show that he did not in fact disobey or impede Abuhadwan in the ways Abuhadwan maintained and the district court found.

Abuhadwan testified that Velazquez responded to his order to disperse by sarcastically stating, "yeah sure."  But other witnesses disputed that Velazquez ever made such a statement.   Instead, they testified that Velazquez was

speaking with his mother when the police arrived, and then approached the officers to simply inquire about what was happening — saying "what's up" or "what's going on." And, although the district court was particularly concerned by Velazquez's alleged statement to Abuhadwan to "fuck off," and indeed asked counsel whether that statement was "something that creates probable cause," the second officer on the scene, Ron, testified that he was four to ten feet away from Abuhadwan but heard no profanity. Other witnesses similarly testified that they never heard Velazquez utter a single profanity. Rather, they recalled *Abuhadwan* stating, "I'm tired of people calling because of you, mother fuckers."

Yet, when plaintiff's counsel argued that Abuhadwan was the only witness who testified that Velazquez said "fuck you," the district judge replied that there was "[n]o evidence to the contrary." That was not so. Velazquez had specifically denied that he made such a statement. When reminded of that detail, the district court pronounced Velazquez generally not credible: "His testimony was not all that great either, because it was I don't remember, I don't remember." And the district judge further commented, when discussing Velazquez's witnesses, that although "they say they didn't hear [the profanities] . . . we don't know that they didn't hear it," remarking that "it appears that the witnesses were prepared to answer those questions." Contrary to the district court's conclusion, a jury could reasonably infer from the testimony of several nearby witnesses — including a police officer — that they did not hear Velazquez say "fuck off" or use any other profanity, and that no such words were uttered.

Other aspects of Velazquez's alleged resistance were also highly contested. Several witnesses, including Ron, the second officer, testified that they never heard Abuhadwan ask

Velazquez to put his hands behind his head before using the arm twist lock.  The district court found — once more — that the fact that "Officer Ron didn't hear it[] doesn't mean anything," and further noted that "[t]he fact that witnesses testified that they didn't hear [Abuhadwan] give any instructions to Mr. Velazquez, doesn't mean that it wasn't done . . . [it] doesn't defeat the evidence that was given in the [matter]."  Moreover, when plaintiff's counsel stated during the Rule 50(a) colloquy that the witnesses were "in a position that if a command was given, they would have heard it," the district court concluded that "[t]here's no evidence of that at all."  But, again, a reasonable jury could view the testimony as demonstrating that the witnesses would have heard the order had it been audibly given, thus confirming Velazquez's and Magana's statements that no such audible order was given.

Witnesses also testified that Abuhadwan did not give Velazquez the opportunity to comply with his command to roll over on his stomach as he was striking him.  Furthermore, numerous witnesses, including Velazquez himself, recalled that Velazquez had shouted that he was "not about violence" several times during the altercation.  And Abuhadwan acknowledged that Velazquez never threatened him or physically assaulted him, although he feared that he might physically assault him from the fact that his feet were in the air.  A reasonable jury could have inferred from this evidence that Abuhadwan had no plausible reason to believe that Velazquez was a physical threat to him, and that Abuhadwan never gave Velazquez an opportunity peacefully to comply once on the ground.

It is evident that, in granting the defendants' motion for judgment as a matter of law on Velazquez's unlawful arrest

claim, the district court did not apply the correct legal standard for granting a judgment as a matter of law after the close of evidence in a civil trial. Instead, the district court disregarded evidence supporting Velazquez's version of events; improperly chose to credit the defense's witnesses over Velazquez's; made adverse credibility findings about Velazquez and his supporting witness; and refused to draw all reasonable inferences in Velazquez's favor. To be sure, the jury could reasonably have believed Abuhadwan's account of the events. But the evidence was far from "one-sided," and surely did not give rise to "but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 252. The district court's grant of judgment as a matter of law was therefore procedurally improper, and cannot stand unless, despite the district court's erroneous analysis, the facts as construed most favorably to Velazquez could only lead a rational jury to the conclusion that Abuhadwan had probable cause to arrest him.

## 3. Proper Substantive Application of Rule 50

Applying the correct Rule 50 analysis, there is no doubt that the unlawful arrest claim should have gone to the jury, as a reasonable jury could have decided in Velazquez's favor. Drawing all reasonable inferences in Velazquez's favor, Velazquez's conduct in this case appears "not only lawful, but . . . protected by the First Amendment." *Johnson*, 724 F.3d at 1174.

According to Velazquez's and the other witnesses' accounts of the incident, the only asserted "resistance" Velazquez posed to Abuhadwan before Abuhadwan decided to detain him was his questioning — "what's up" or "what's going on" — aimed at learning why the police officers arrived in front of his home. Such benign questioning cannot

give rise to probable cause that Velazquez "willfully resist[ed], delay[ed], or obstruct[ed]" a police officer, Cal. Penal Code § 148(a)(1), within the meaning of the statute. The constitutional guarantee of free speech precludes criminalizing even strong expressions of frustration or dislike, whether directed at a law enforcement officer or someone else. *See United States v. Poocha*, 259 F.3d 1077, 1082 (9th Cir. 2001); *Duran*, 904 F.2d at 1378.

Rather, on Velazquez's version of events, a reasonable jury could infer that the likely "motive" for Abuhadwan's detention and subsequent arrest of Velazquez was "retaliation" for a perceived challenge to the officer.[10]

---

[10] Although the Officers acknowledge that "any alleged public intoxication did not factor into the district court's . . . ruling," they tersely contend on appeal that "there was reasonable suspicion to detain" him on this basis nonetheless. However, "[i]ssues raised in a brief that are not supported by argument are deemed abandoned." *Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996).

In any event, under California law, a criminal defendant must be "incapacitated as a result" of a substance to be convicted of public intoxication under Section 647(f). *People v. Rich*, 72 Cal. App. 3d 115, 122 (1977). The evidence at trial, including Abuhadwan's own testimony, indicates that Velazquez at no point appeared "unable to exercise care for his . . . own safety or the safety of others." Cal. Penal Code § 647(f). In front of his own home leaning on a car, in the presence of his mother and a group of friends, he was in no apparent danger at all. Nor was there any evidence that he was endangering anyone around him when Abuhadwan decided to detain him. Thus, a reasonable jury could have found that Abuhadwan's initial investigation and detention was unsupported by reasonable suspicion that Velazquez had violated Section 647(f). That Velazquez was later found to have had a blood alcohol level of 0.15 or higher is of no relevance. That blood level was not known at the time Abuhadwan decided to detain him. More importantly, a BAC level of 0.15 or higher is a Long Beach police minimum benchmark for a public

*Duran*, 904 F.2d at 1378. That is, a reasonable jury could conclude that Abuhadwan might simply have been upset at being subjected to what he believed to be mild sarcasm or disrespect, and that Abuhadwan then arrested Velazquez for the "offense of 'contempt of cop,' in which officers charge resisting arrest or failure to obey or other minimal procedural offenses simply to punish or exact retribution on disrespectful or non-submissive individuals." Erin Murphy, *Manufacturing Crime: Process, Pretext, and Criminal Justice*, 97 Geo. L.J 1435, 1451 n.50 (2009). But, as we held in *Duran*, "law enforcement officers may not legitimately rely" on such a basis for arrest, as doing so "would constitute a serious First Amendment violation." 904 F.2d at 1377–78.[11]

Nor did the events that took place after the initial detention justify the arrest, on Velazquez's version of events. According to Velazquez, he did not resist later, either — he was never told to put his hands behind his head and never refused to do so, whether by uttering a profanity or otherwise. *Cf. Mackinney*, 69 F.3d at 1006–07. In any event, "[i]t is well established under California law that even 'an outright refusal to cooperate with police officers cannot create adequate grounds for [police] intrusion' without more." *Id.* at 1006 (alteration in original) (quoting *People v. Bower*, 24 Cal.3d

---

intoxication arrest, not a substitute for the statutory lack of safety elements.

[11] Moreover, "contempt of cop" arrests may have other pernicious consequences, such as wasting police resources and harming the overall relationship between police departments and local communities. *See* Christy E. Lopez, *Disorderly (mis)Conduct: The Problem with "Contempt of Cop" Arrests* (June 2010), https://www.acslaw.org/sites/default/files/Lopez_Contempt_of_Cop.pdf.

638, 649 (1979)).  Furthermore, according to Velazquez and the other witnesses, he was immediately thrown to the ground; he was not first walked toward the police car, and so never pulled away from Abhuhadwan while doing so. According to those witnesses, Velazquez was never given a chance to roll over; never had his legs in the air; and never verbally or physically threatened Abuhadwan.

Crediting Velazquez's account of the incident — as we must on a Rule 50(a) motion — Velazquez's conduct provided Abuhadwan no lawful basis to justify detaining, let alone arresting, Velazquez.  At most, Velazquez's statements to Abuhadwan could be interpreted as expressing skepticism about Abuhadwan's intervention.  But "[c]riticism of the police, profane or otherwise, is not a crime."  *Poocha*, 259 F.3d at 1082; *see also Duran*, 904 F.2d at 1378.  In "detain[ing] [Velazquez] without reasonable suspicion," Abuhadwan was "not lawfully performing h[is] duties" under California law. *Garcia*, 177 Cal. App. 4th at 819; *see also In re Manuel G.*, 16 Cal. 4th at 815.  And, for the purposes of Section 148(a)(1), where police officers "ha[ve] no lawful basis for stopping" an individual, they "ha[ve] no lawful basis to pursue and arrest [that individual] for not acceding to the investigatory stop." *Johnson*, 724 F.3d at 1178.

In sum, there was sufficient evidence for a jury to conclude that Abuhadwan had no lawful basis upon which to detain or investigate Velazquez, and thus that Abuhadwan unlawfully arrested Velazquez for resisting or obstructing a police officer in violation of Section 148(a)(1).  We reverse

the district court's grant of judgment as a matter of law as to Velazquez's unlawful arrest claim.[12]

## 4. Effect on Excessive Force Claim

Although Velazquez does not challenge the sufficiency of evidence as to the jury's verdict on his § 1983 excessive force claim, he contends that the district court's grant of judgment as a matter of law on his unlawful arrest claim so substantially prejudiced the jury's consideration of the excessive force claim as to warrant reversal of the verdict. We agree. Removal of the unlawful arrest claim from the jury's consideration, in combination with the district court's jury instructions, fatally infected the jury's verdict as to excessive force.

**(i)** Under *Graham v. Connor*, 490 U.S. 386 (1989), determining whether force used in making an arrest is excessive calls for a fact-intensive inquiry requiring attention to all circumstances pertinent to the need for the force used. *See id.* at 396; *see also Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (the "objective reasonableness" of officers' use of force "is determined by an assessment of the totality of the circumstances"). "[T]here are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must still slosh [their] way through the factbound morass of 'reasonableness.'" *Mattos v. Agarano*,

---

[12] At oral argument, the City's counsel contended for the first time that the officers had reason to believe that Velazquez and the other individuals present at the scene were disturbing the peace, in violation of California Penal Code Section 415. As this argument was not mentioned in district court or the appellate briefs, it is waived on appeal. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009).

661 F.3d 433, 441 (9th Cir. 2011) (en banc) (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). Therefore, courts "are free to consider issues outside the three enumerated [in *Graham*] when additional facts are necessary to account for the totality of circumstances in a given case." *Id.*

As we have recognized, "[b]ecause the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa." *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004). Just proving lack of probable cause for the arrest, for instance, does not establish that the police used excessive force, or, indeed, any force. *See Mattos*, 661 F.3d at 443 n.4 (rejecting plaintiff's argument that "*any* amount of force against her" was excessive if the officers did not have probable cause, as the absence of probable cause alone is insufficient to establish excessive force). And force used by an officer to effectuate an arrest, "regardless of whether [the officer] had probable cause to [make the] arrest," may still be reasonable, for instance to overcome the arrestee's forcible resistance. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921–22 (9th Cir. 2001).[13]

---

[13] Like this court, all other circuits that have addressed the question prohibit a finding of excessive force predicated *only* on the fact of unlawful arrest. *See Snell v. City of York, Pa.*, 564 F.3d 659, 672 (3d Cir. 2009); *Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) (en banc); *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007); *Papineau v. Parmley*, 465 F.3d 46, 61–62 (2d Cir. 2006); *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1331–32 (11th Cir. 2006); *Bodine v. Warwick*, 72 F.3d 393, 400–01 (3d Cir. 1995). That principle, however, is fully consistent with the recognition that "the damages recoverable on an unlawful arrest claim include damages suffered because of the use of force

Nevertheless, *Graham* counsels that the facts that gave rise to an unlawful detention or arrest can factor into the determination whether the force used to make the arrest was excessive. *Graham* held that a constitutional complaint of excessive force arises under the Fourth Amendment and constitutes a claim concerning the overall reasonableness of a seizure. *See* 490 U.S. at 394–97. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985)). Determining whether a seizure is unreasonable because the force used was excessive "requires careful attention to the facts and circumstances of each particular case," including the consideration of the factors set forth in *Graham*: the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. "Underlying *Graham*'s objective-reasonableness test is the clear principle that the force used to make an arrest must be balanced against the need for force: it is the *need* for force which is at the heart of the *Graham* factors." *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (internal quotation marks omitted).

Applying these principles, the facts underlying the seizure are pertinent in judging the overall reasonableness of the seizure for Fourth Amendment purposes, including the

---

in effecting the arrest." *Bashir*, 445 F.3d at 1332 (internal quotation marks omitted); *see also Bodine*, 72 F.3d at 400.

reasonableness of the force used to effectuate the seizure. *Graham* specifies "the severity of the crime at issue" as one of the factors to be considered, and stresses the need to attend to the specific "facts and circumstances of each particular case." 490 U.S. at 396. Conducting this fact-based inquiry encompasses a consideration of the facts known to the police officers at the time. *Id.* Where officers are presented with circumstances indicating that no crime was committed, the "severity of the crime at issue" factor is necessarily diminished as a justification for the use of force — although, as our cases have held, the force used may still be reasonable if the other *Graham* factors taken together favor that conclusion.

The Second and Third Circuits's approaches to the intersection of unlawful arrest and excessive force claims are compatible with ours, as they hold the *Graham* reasonableness analysis applicable to an excessive force issue whether or not there is also an unlawful arrest claim. *See Papineau*, 465 F.3d at 61–62; *Bodine*, 72 F.3d at 400–01. In *Papineau*, for instance, then-Judge Sotomayor explained that "the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest." 465 F.3d at 62. And, although the Eleventh Circuit in *Bashir* held that a claim that officers "used excessive force in the arrest because they lacked the right to make the arrest . . . is not a discrete constitutional violation [as] it is dependent upon and inseparable from [an] unlawful arrest claim," it stressed that the claim presented there was "predicated *solely* on allegations the arresting officer lacked the power to make an arrest." 445 F.3d at 1332. Indeed, *Bashir* compared the circumstances there with *Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir. 1998),

a case in which the court had found that officers use excessive force *and* committed an unlawful arrest.    In *Thornton*, *Bashir* explained, the *Graham* factor analysis indicated that "'the officers were not justified in using *any* force.'"    445 F.3d at 1333 (quoting *Thornton*, 132 F.3d at 1400). *Bashir*'s approach, therefore, is likewise compatible with ours detailed above.

The Tenth Circuit's inquiry in cases "involving claims of both unlawful arrest and excessive force arising from a single encounter," adopted without further elaboration by the Fifth Circuit, appears on the surface somewhat different from our analysis and that of the other circuits.  *Cortez*, 478 F.3d at 1127–30; *see also Freeman*, 483 F.3d at 417.  *Cortez*'s excessive force framework requires assuming a *hypothetical* lawful arrest for purposes of an excessive force claim, even where there was none.  478 F.3d at 1129.  *Cortez* thus rejected one of the plaintiffs' excessive force claims as the force used "d[id] not exceed what would have been reasonable to effectuate a lawful arrest under the[] circumstances," even though the plaintiff was arrested without probable cause.  *Id.*; *see also Romero v. Story*, 672 F.3d 880, 890 (10th Cir. 2012) (explaining that, under *Cortez*, district courts facing unlawful arrest and excessive force claims "must . . . analyze the excessive force inquiry under the assumption the arrest was lawful"); *Freeman*, 483 F.3d at 417 ("[W]e must . . . analyze the excessive force claim without regard to whether the arrest itself was justified.").

Still, in practice, *Cortez* seems to have applied an approach similar to ours, as it did take into account the circumstances underlying the arrest when assessing whether excessive force was used.  Taking the plaintiffs' allegations

as true, *Cortez* first concluded that plaintiff Tina Cortez's detention was unlawful. It then looked to the facts underlying that detention in making its excessive force determination in favor of Tina Cortez, including the facts that she "was never the target of the investigation," and posed no safety or flight threat. *Cortez*, 478 F.3d at 1130–31.

Moreover, the excessive force claim *Cortez* rejected involved simply the force required to effectuate an arrest. *Id.* at 1126 (the force consisted of officers "(1) grabb[ing] [plaintiff Rick Cortez] by the arm and pull[ing] him from the doorway of his home; (2) handcuff[ing] him; (3) plac[ing] him in the back seat of a locked patrol car"). We thus cannot say what the Tenth Circuit would conclude in a case like this one, where the force the officers applied could likely have resulted, according to Abuhadwan himself, in "serious bodily injury," if not death.

In sum, we conclude that, under *Graham*, an excessive force analysis takes into account, among other considerations, the facts known to the police at the time of the arrest with respect to the alleged offense that triggered the arrest.

**(ii)** Proceeding under *Graham*, we conclude that the grant of the Rule 50(a) motion on the lawfulness of the arrest, in conjunction with the district court's instructions on the excessive force claim, improperly influenced the jury's consideration of Velazquez's excessive force claim. The judgment on the excessive force claim therefore cannot stand.

The bulk of the evidence presented by both sides went to both the lawful arrest and excessive force claims, and the circumstances underlying Velazquez's arrest were a central issue from the outset. On the first day of trial, the district

judge explained to the jury that they had been called to "an excessive force . . . and an arrest" case.  Moreover, throughout the trial, the central theory of Velazquez's case was that Abuhadwan had no basis for detaining or arresting him.

Yet, as it turned out, the jury was not provided any real opportunity to consider, as part of the excessive force claim, the circumstances that justified, or did not justify, the detention and arrest.  When instructing the jury on excessive force, the district court explained that "a seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force in making a *lawful arrest*." Because a verdict had been directed as to the lawfulness of the arrest, no jury instructions provided the jury with the elements of the California crimes asserted to have provided reasonable suspicion or probable cause for the detention and arrest, or directed the jury to consider as part of the excessive force claim the basis for the detention and arrest.  The Ninth Circuit Model Jury Instructions expressly direct district courts to instruct juries considering § 1983 unlawful arrest claims as to the "elements or description of applicable crime for which probable cause must have existed."  9th Cir. Model Civ. Jury Instr. 9.20 (2007).  Had the unlawful arrest claim gone to the jury, as it should have, these matters would have been before the jury, front and center.

Instead, the district court effectively required the jury to presume that the arrest *was* constitutionally lawful, and so not to consider facts concerning the basis for the arrest.  Doing so removed critical factual questions that were within the jury's province to decide.  For instance, by taking from the jury the question whether Abuhadawan's arrest of Velazquez for resisting or obstructing a police officer was lawful, the

district judge implied simultaneously that Velazquez was *in fact* resisting or failing to obey the police officer's lawful instructions. Presuming such resistance could certainly have influenced the jury's assessment of "the need for force," *Blankenhorn*, 485 F.3d at 480, as well as its consideration of the other *Graham* factors, including "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396. By erroneously granting judgment as a matter of law on Velazquez's unlawful arrest claim, the district court impermissibly truncated the jury's consideration of Velazquez's excessive force claim. Accordingly, we reverse the jury's verdict.[14]

## B. *Monell* Claims

We also reverse the district court's grant of the City's motion for a judgment as a matter of law on Velazquez's municipal liability claims.

Municipalities may be held directly liable for constitutional violations under 42 U.S.C. § 1983, but they "cannot be held liable . . . on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. "Rather, . . . a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1232–33 (9th Cir. 2011) (internal quotation marks omitted). "[A] custom or practice can be inferred from . . . evidence of repeated constitutional violations for which the errant municipal officers were not discharged or

---

[14] Because we reverse the jury's verdict on the excessive force claim on this ground alone, we do not address Velazquez's evidentiary arguments as to the excessive force claim.

reprimanded." *Id.* at 1233 (internal quotation marks omitted). Evidence of "identical incident[s]" to that alleged by the plaintiff may establish that a municipality was put on notice of its agents' unconstitutional actions, *Henry v. Cnty. of Shasta*, 132 F.3d 512, 518–21 (9th Cir. 1997), *opinion amended on denial of reh'g*, 137 F.3d 1372 (9th Cir. 1998), while general evidence of departmental treatment of complaints and of the use of force can "support[] the [plaintiff's] theory that . . . disciplinary and complaint processes . . . contributed to the police excesses complained of because the procedures made clear to [the] officer that . . . [he] could get away with anything," *Larez v. City of L.A.*, 946 F.2d 630, 646–47 (9th Cir. 1991).

Velazquez advanced several theories of *Monell* liability for excessive use of force, one of which was that the City had a policy or custom of failing to investigate and discipline officers who had allegedly committed prior instances of excessive force. In his pre-trial motions, Velazquez represented that Abuhadwan in particular had received "ten citizen complaints regarding his conduct," that three of these complaints involved excessive force, and that Abuhadwan had over "30 internal affairs incidents of force since 2007, 19 of them using a baton or flashlight." At the start of trial, however, without any explanation, the district court granted Defendants' motion *in limine* to "preclude reference to complaints, Internal Affairs, and discipline."[15] As a result, the evidentiary basis for a failure-to-discipline *Monell* theory was never presented to the jury.

---

[15] Defendants had argued that such evidence was irrelevant to establishing Velazquez's *Monell* claims, in addition to causing prejudice and constituting inadmissible character evidence.

"Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. The excluded evidence was relevant, indeed critical, to prove that the City was aware of Abuhadwan's alleged tendency to use excessive force.

The district court may have been concerned that permitting the introduction of evidence of prior complaints would have suggested to the jury that Abuhadwan acted in accordance with these past actions. *See* Fed. R. Evid. 404(b). But any such suggestion could have been cured short of categorical exclusion by an appropriate limiting instruction. *See, e.g.*, *United States v. Ramos-Atondo*, 732 F.3d 1113, 1124 (9th Cir. 2013) (noting that any "practical prejudice" resulting from the admission of Rule 404(b) evidence can be "minimized by the district court's careful limiting instruction to the jury"); *Dubria v. Smith*, 224 F.3d 995, 1002 (9th Cir. 2000) ("[C]autionary instruction[s] [are] presumed to have cured prejudicial impact."). Instead, the district court entirely prevented Velazquez from developing a potentially meritorious *Monell* claim, without any explanation for its decision.

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996), is particularly instructive in explaining why the exclusion of the proffered lack-of-discipline evidence was an abuse of discretion. The plaintiff in *Beck* presented five prior complaints of excessive force against the defendant officer in support of his *Monell* claim and demonstrated that none of the complaints resulted in disciplinary action. *Id.* at 973. *Beck* recognized that "evidence of other wrongs or acts [that are] not admissible to prove the character of a person" under Federal Rule of Evidence 404(b) was nonetheless admissible for "proof of knowledge" on the part of the police

department.  *Id.*  Based on the admitted evidence, *Beck* held that "a reasonable jury could have inferred that the Chief of Police knew, or should have known, of [the officer's] propensity for violence when making arrests."  *Id.*

As in *Beck*, a jury might have been able reasonably to infer from prior complaints that the Long Beach Police Department was aware that Abuhadwan had previously used excessive force when making arrests, but had taken no steps to curb his propensity.  By precluding any reference to such evidence, the district court prevented Velazquez from even attempting to make such a showing.  We thus hold the district court's categorical exclusion of evidence relevant to establishing Velazquez's theory of municipal liability an abuse of discretion.

In granting judgment as a matter of law, the district court concluded that "a reasonable jury would not have a legally sufficient evidentiary basis to find for" Velazquez on his municipal liability claim.  Fed. R. Civ. P. 50(a).  But when the district court categorically excluded relevant *Monell* evidence, it "invaded the province of the jury," to whom the excluded evidence may well have made a difference. *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014).

The City does not argue that this exclusion of potentially critical evidence  was harmless.  *See C.B.*, 769 F.3d at 1021. We therefore hold that the "incorrect evidentiary ruling resulted in the judge erroneously entering judgment as a matter of law for the defendants," *Stuhlmacher*, 774 F.3d at 409, and reverse the district court's grant of judgment as a matter of law on the *Monell* claims.

## C.  State Law Claims

The district court dismissed Velazquez's state law claims, over plaintiff counsel's objection, on the ground that instructing on both federal and state liability for false arrest and excessive force would confuse the jury.  The dismissal of the state law claims was error.

A district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); *see also Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 965 (9th Cir. 2007).  Here, the district court did not dismiss all of Velazquez's federal claims when it dismissed his state law claims, as it sent Velazquez's § 1983 excessive force claim to the jury.  Nor did the district court suggest that the dismissal was based on one of the other reasons set forth in § 1367(c) — for example, that the state law claims "raise[d] a novel or complex issue of State law" or "substantially predominate[d] over the claim or claims over which the district court has original jurisdiction." 28 U.S.C. § 1367(c).  Moreover, the district court gave no reason to believe that the general considerations underlying the supplemental jurisdiction doctrine — "judicial economy, convenience, fairness, and comity" — counseled dismissal of the state-law claims.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Rather, the district court's sole explanation for the dismissal was that instructing the jury on the § 1983 claims while simultaneously instructing it on the state claims for false arrest and assault and battery would be difficult or misleading.  But such claims are routinely combined in district courts, and we are unaware of any case in which

prejudicial confusion resulted. *See, e.g.*, *Chaudhry v. City of L.A.*, 751 F.3d 1096, 1102 (9th Cir. 2014) (reviewing jury verdict on both § 1983 excessive force and state-law assault claims); *Mahach-Watkins v. Depee*, 593 F.3d 1054, 1056 (9th Cir. 2010) (reviewing jury verdict on both § 1983 excessive force and state-law tort claims). Careful instructions should be sufficient to highlight for the jury the differences between the elements of the federal and the state causes of action. "[J]uries are presumed to follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). In any case, the district court gave *no* reason for its dismissal of Velazquez's separate state law claims of negligence and intentional infliction of emotional distress.

We therefore hold that the district court abused its discretion in blanketly refusing to exercise supplemental jurisdiction, and so reverse its dismissal of Velazquez's state law claims.

### III. Conclusion

"Police officers have a difficult job, and they deserve the respect of their community." *Mackinney*, 69 F.3d at 1007. At the same time, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 462–63. And plaintiffs in § 1983 cases challenging police action, like other plaintiffs in civil cases in federal court, have a constitutionally-based right to a jury verdict as long as they present evidence on which a reasonable jury could decide in their favor.

Velazquez was not accorded his right to such a verdict at all on his unlawful arrest and *Monell* claims. And on the excessive force claim, the jury's verdict was fatally infected by the trial judge's ruling on the Rule 50(a) motion. Accordingly, for the reasons set forth above, we **reverse** the district court's grant of judgment as a matter of law as to the unlawful arrest and *Monell* claims, **reverse** the jury's verdict on the excessive force claim, **reverse** the district court's dismissal without prejudice of the state law claims, and **remand** for a new trial.

Furthermore, we instruct the Chief Judge for the Central District of California to reassign this case to a different district judge on remand. Although the district judge may have intended to afford Velazquez a fair trial, reassignment is warranted here because the judge may "have substantial difficulty in putting out of his . . . mind previously expressed views or findings determined to be erroneous." *United States v. Rivera*, 682 F.3d 1223, 1237 (9th Cir. 2012) (internal quotation marks omitted).

During the Rule 50 colloquy, for example, the district judge frequently indicated that he disbelieved Velazquez and his witnesses. He also stated to Velazquez's counsel, as if the practice of preparing witnesses were unusual or made the testimony suspect, that "it appears that the witnesses were prepared to answer those questions." Furthermore, the record reveals that, during trial, the district judge criticized and rebuked Velazquez's counsel numerous times — often for exceedingly minor issues — while maintaining a more

permissive and accommodating approach toward defense counsel.[16]

"Litigants are entitled to a fair trial and a perception that the presiding judge does not possess a bias that will affect rulings during trial." *Montiel v. City of Los Angeles*, 2 F.3d 335, 344 (9th Cir. 1993). Reassignment is therefore "advisable to preserve the appearance of justice." *Rivera*, 682 F.3d at 1237.

**REVERSED AND REMANDED.**

---

[16] For example, the district judge at several points during the trial rebuked Velazquez's lawyer for thanking him, stating "Mr. Zola, I don't have to be thanked for anything. I'm not here to do anybody on either side any favors," and "don't thank me for anything I do. I do it because I am required to do it under my oath." The judge also criticized the lawyer for saying "good afternoon."