Filed 6/18/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F074841 |
| Plaintiff and Respondent, | (Super. Ct. No. 15CR-01076) |
| v. | |
| TYSON PERRY, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  David W. Moranda, Judge.

J. Courtney Shevelson and Alison Berry Wilkinson for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and David Andrew Eldridge, Deputy Attorney General, for Plaintiff and Respondent.

Larry D. Morse II, District Attorney, and Thomas Min, Deputy District Attorney, for Merced County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

-ooOoo-

Appellant Tyson Perry is a former police officer who used force against a private citizen during an arrest.  He challenges his conviction for unnecessarily assaulting or

beating another person while acting under color of authority. (Pen. Code, § 149.[1]) He contends the jury instructions and prosecutor's argument encouraged conviction under a legally erroneous and factually unsupported theory. As we explain, we agree reversal is required. We reverse the judgment and remand for further proceedings.

## PROCEDURAL HISTORY

Perry was charged with assault by a public officer (§ 149; count 1), battery with serious bodily injury (§ 243, subd. (d); count 2), and misdemeanor battery (§ 242; count 3). Count 3 was dismissed prior to trial on the ground the statute of limitations had run.

A jury found Perry guilty on count 1. On count two, the jury acquitted Perry of battery with serious bodily injury but found him guilty of simple misdemeanor battery as a lesser included offense. On the People's motion, the court dismissed the misdemeanor count for violation of the statute of limitations.

Perry was given a suspended sentence and placed on probation for three years with various conditions, including a 90-day commitment to county jail.

## FACTUAL BACKGROUND

This matter arises out of Perry's intervention in a child custody dispute while he was a police officer with the Livingston Police Department.

### *Child Custody Order*

Father and Mother[2] were engaged in disputes over the custody of Daughter for nearly their entire relationship. At the time of the incident at issue here, Daughter was 15 years old and Father and Mother were subject to a mediated custody order. The order provided Father and Mother would split custody of Daughter on alternating weekends,

---

[1] Undesignated statutory references are to the Penal Code.

[2] To preserve the privacy of the victim, the victim's daughter, and witnesses, their names have been anonymized or abbreviated. No disrespect is intended.

2.

which began at 8:00 a.m. or the start of school on Friday. The weekend custody period ended at 8:00 a.m. or the start of school on Monday. Mother was given custody from that time until 8:00 a.m. or the start of school on Wednesday, at which time custody transferred to Father until 8:00 a.m. or the start of school on Friday. School day transitions were to be "directly to and from school." All other transitions would take place at the Livingston Police Department. The parties could mutually agree to changes; absent such agreement, the custody order prevailed.

The order directed Mother and Father to contact the local police or sheriff for problems with enforcement of the order and stated, "Law enforcement personnel are mandated to assist." Failure to abide by the terms of the order was noted to be deemed a violation of "Sections 166.4 (Contempt of Court), 273.6 (Violation of a Court Order), and 278.5 (Violation of Custody or Visitation Decree)."

The order was signed by both Mother and Father.

*Events Preceding the Dispute*

The weekend preceding the dispute was Father's custody weekend. Over the weekend, Daughter took a school trip to an amusement park. On Sunday, she and several other students were caught shoplifting. Father was informed of the incident and was told Daughter likely would be suspended from school. Father and Mother exchanged numerous text messages regarding the situation well into the night. In one, Father told Mother to be prepared to pick Daughter up at school the next day if she was suspended. Daughter returned from the trip around midnight and Father and Daughter talked about what had occurred until 1:00 or 1:30 a.m.

The next morning, Father took Daughter to school. Daughter went to class and Father went to the office. The vice principal called Daughter and Father into the office and suspended Daughter from school for three days. Father was told to remove Daughter from the school grounds. Mother did not come to the school while Father was there, from 8:00 a.m. to 9:00 a.m.

3.

Father and Daughter went to Father's car, where they sat together for a time. They did not see Mother. Father took Daughter to breakfast but she then asked to go home. Father did not immediately contact Mother. Father took Daughter to his house, where they arrived between 9:00 and 10:00 a.m. Daughter went to her room and fell asleep.

At 10:28 a.m., Father texted Mother to ask whether she wanted to switch custody days to give him Monday to Wednesday so Mother could have Daughter from Wednesday through the upcoming holiday weekend. Mother declined. At 11:14 a.m., Mother texted Father asking why he had not told Mother he picked up Daughter and stating she was on her way to retrieve Daughter. Father told Mother Daughter was sleeping and stated Mother could come when Daughter woke up. Father and Mother exchanged a series of hostile text messages that concluded with Father telling Mother he would text Mother to pick up Daughter when Daughter awoke.

### Mother Seeks Police Intervention

Mother went to the Livingston Police Department and spoke with Officer Michael Baker, who was covering dispatch when she arrived. Mother asked for assistance retrieving Daughter from Father. Officer Baker radioed Perry for assistance because Perry was the officer taking calls for service at that time. Perry arrived and he and Officer Baker reviewed the custody order and determined it was Mother's custody time. Mother showed the officers Father's text messages, reported Father had refused to turn over Daughter, and told them she was concerned for Daughter's safety because Father struck Daughter in the past. While at the police department, Mother twice tried to call Father but he did not answer.

Perry testified he believed his conversation with Mother and review of the custody order and Mother and Father's text messages provided "reasonable suspicion that there was a potential violation of a custody order." Perry and Officer Baker formulated a plan for Perry and Mother to meet at Father's residence for Perry to do a civil standby for

4.

exchange of Daughter. Perry and Mother left the station while Officer Baker remained behind on dispatch.

*Arrest of Father*

Mother and Perry approached Father's front door together. Mother knocked on the door and Father responded. Father activated an audio recorder on his phone, which recorded the ensuing verbal exchange. The recording was admitted into evidence and played for the jury.[3] Mother, Father, Perry, Officer Baker, and Father's neighbor testified at trial regarding what had occurred.

### A. The Recording

The recording captured the following exchange:

"[FATHER]: Oh, Man.

(Sounds of door opening.)

Yeah?

[MOTHER]: Hi. We're here to pick up [Daughter].

[FATHER]: She's asleep. I'm not waking her up.

MR. PERRY: Hi. Can you grab your daughter?

MALE SPEAKER: (Indiscernible.)

[FATHER]: No, I'm not going to (indiscernible). She's asleep.

MR. PERRY: You're in violation of a custody order.

[FATHER]: Let me see the custody order.

MR. PERRY: Stop. Take your hands out of your pockets. Don't approach me in that fashion. Do not do that to me, sir. Okay? You may have problems with –

[FATHER]: You're on my property, sir. Get off my property.

---

[3] Two transcripts with slight variations were provided to the jury for reference. The differences are immaterial. We quote from the People's transcript.

MR. PERRY:        No.

[FATHER]:         Get off my property now.

MR. PERRY:        Do you really want to go there?

[FATHER]:         Yes.  Get off my property now.

MR. PERRY:        It's not going to happen.  I'm not leaving the property.

[FATHER]:         Get off my property.

MR. PERRY:        You're in violation.

[FATHER]:         Let me see the custody order.  Let me see it.

MR. PERRY:        Get your finger out of my face.

[FATHER]:         Get your finger out of my face.

MR. PERRY:        Turn around.

[FATHER]:         Let me see the custody order.

MR. PERRY:        Hey, when you can, 98.[4]

[FATHER]:         Let me see the custody order you are referring to.

MR. PERRY:        Turn around.

[FATHER]:         No.  Why should I turn around?  Let me see the custody order.

MR. PERRY:        Yeah, affirming extremely 13 16.[5]

[FATHER]:         Let me see the custody order.  Where is it?  I'm asking you a question.

[MOTHER]:         Wait, is it not my day today?

---

[4] Perry and Officer Baker explained the code "1198" is a request for "cover" or for another officer to meet at the requesting officer's location.

[5] Although the transcript states, "affirming extremely 1316," Perry and Officer Baker testified Perry actually stated "1369," which is code for "that person is being an asshole."

6.

[FATHER]: Where is the custody order?

[MOTHER]: It's not my day today?

[FATHER]: Well, let me see your custody order.

[MOTHER]: I have one custody order there, and then they have the other one.

[FATHER]: Go get it. Go get it. I want to see it. Go get it.

[MOTHER]: What for? It's not my day today?

MR. PERRY: You know what's in it – you know what's in it, big guy.

[MOTHER]: Tell me if it's not my day today.

[FATHER]: Go get the custody order.

MR. PERRY: You know what's in it. Nah, it's not going to happen.

[FATHER]: Why not?

MR. PERRY: Because.

[FATHER]: Then get off my property.

MR. PERRY: Nope.

[FATHER]: Get off my property.

MR. PERRY: Nope.

[FATHER]: Are you going to violate my property rights right now?

MR. PERRY: What property rights?

[FATHER]: My property rights.

MR. PERRY: Get your hands out of your pockets.

[FATHER]: This is my property. I'm asking you a question. Get off my property.

MR. PERRY: No.

[FATHER]:		Why not?

MR. PERRY:		Because I said so.

[FATHER]:		Where's your right to be on my property right now? Where's your right? Where's your right? I'm asking you a question. Are you not listening to me?

MR. PERRY:		No, I'm not.

[FATHER]:		Okay. So where is the custody order?

MR. PERRY:		One of two things are going to happen. Okay?

[FATHER]:		You're going to get off my property or you're going –

MR. PERRY:		You're either going to comply and wake up your daughter – to give her to the lawful guardian –

[FATHER]:		Oh, no. You might have already woken her up. You might have already woken her up actually with all your screaming.

MR. PERRY:		– or I'm going to put you in handcuffs, put you in the back of my car and then I'm going to –

[FATHER]:		You can do whatever you think is necessary, but you're not going to violate my rights.

MR. PERRY:		Okay.

[FATHER]:		Right? Are you going to violate my rights?

MR. PERRY:		Oh, I would never violate your rights.

[FATHER]:		Then get off my property unless you show me some cause.

MR. PERRY:		Not going to happen.

[FATHER]:		Where is the custody order? I'm asking you a question.

MR. PERRY:		Okay. I already told you.

[FATHER]:		Why don't you go stand over there with her –

MR. PERRY:		Okay.

8.

[FATHER]: – off my property until you have a right.

MR. PERRY: Okay.

[FATHER]: Okay. Then go do that. Get off my property.

MR. PERRY: No. Nope.

[FATHER]: Why not?

MR. PERRY: Because.

[FATHER]: Because what? I'm asking you a question, Mr. Perry. Why don't you get off my property?

MR. PERRY: Sergeant Perry.

[FATHER]: Sergeant Perry, why don't you get off my property? Why don't you get off my property? I'm asking you a question.

MR. PERRY: It's not going to happen.

[FATHER]: Why not?

MR. PERRY: Because.

[FATHER]: Where is your custody order?

MR. PERRY: Turn around.

[FATHER]: Why? You're on my property. What have I done?

MR. PERRY: Turn around. Turn around.

[FATHER]: I don't want to turn around.

MR. PERRY: Turn around or I'm going to make you turn around.

[FATHER]: Why are you going to make me turn around?

MR. PERRY: You don't want to comply. You said you're not going to give up the daughter.

[FATHER]: I want to see –

MR. PERRY: You're in violation of a custody order.

9.

[FATHER]:          No, I'm not – where is my custody?  Where is my custody order?  Where is the custody order?  Where is it at?  I don't have a custody order.  Where is it at?

MR. PERRY:          See, I told you this would happen one of two ways.

     (Sounds.[6])

[FATHER]:          Now you want to hurt me?

MR. PERRY:          Spread your feet.

[FATHER]:          You want to push me that hard?

MR. PERRY:          Spread your feet.

[FATHER]:          You want to push that hard?  Where is the custody order?  She doesn't have a custody order.  You're violating my rights right now.

MR. PERRY:          I told you.  (sound)

[FATHER]:          You're on my property.  (sound)  On my property and you're being loud and you are waking up my kid.

MR. PERRY:          Okay.  (sound)

[FATHER]: (to [Mother]):  Is this what you did last time when I went to pick her up and she was asleep?  Is that what you did, [Mother]?

MR. PERRY:          Stop.  Stop.  Nobody told you to move.

[FATHER]:          Why you fucking squeezing that?

MR. PERRY:          Stop.

[FATHER]:          Why are you fucking squeezing that?

MR. PERRY:          Stop.  Stop.

[FATHER]:          I'm asking you a question.

MR. PERRY:          No one told you to move.

---

[6] Father contended the sounds heard on the recording were the sounds of the handcuffs ratcheting tighter.

10.

[FATHER]:           You fucking bully.  Why are you –

MR. PERRY:          Stop.

[FATHER]:           Why'd you do that?  Why are you doing that?  I'm asking you a question.

MR. PERRY:          Because you won't stop moving.  (sound)

[FATHER]:           Are you watching this, Mr. Baker?  Are you watching this?

OFFICER BAKER:  Sir, please stop.

[FATHER]:           Are you watching this, dude?

OFFICER BAKER:  Sir, just stop.

[FATHER]:           Are you watching him be a fucking dick –

OFFICER BAKER:  Please stop.

[FATHER]:           – squeezing this?

OFFICER BAKER:  Please stop.

[FATHER]:           What am I doing?  I'm not even moving.  (sound)

MR. PERRY:          See, there you go, moving your hands.

    (Overlapping speakers indecipherable.)

MR. PERRY:          Now you're moving your feet, dude.  Come on.

OFFICER BAKER:  You're being difficult.  Stand still.  Just stand still and look straight ahead.

MR. PERRY:          God.

OFFICER BAKER:  Just don't be difficult.

MR. PERRY:          You know how this works.  (sound)

[FATHER]:           Are you going to squeeze it a little harder?

MR. PERRY:          – If I need to –

11.

[FATHER]:           – going to squeeze it a little harder?

MR. PERRY:          – yes.

[FATHER]:           Yeah?  How hard are you going to squeeze this?

MR. PERRY:          God.

[FATHER]:           How hard are you going to fucking squeeze this?

        (sounds.)

[FATHER]:           Come on.  How hard are you going to squeeze it?
(sound)  Are you going to hit my head on the ground now?

[MALE SPEAKER]: Roll over.

MR. PERRY:          Roll over on your stomach.

OFFICER BAKER:  Roll over.

        (sounds.)

[FATHER]:           You just crushed my glasses.

OFFICER BAKER: You got that double-locked yet?

MR. PERRY:          No.

[FATHER]:           You're going fucking kill me, dude.  I haven't done
nothing wrong.  I just don't want to wake up my daughter.

[MOTHER]:  Is this door open?

        (Indiscernible.)

[FATHER]:           Don't go in my house.  You're not allowed to go in my
house.

[MOTHER]:           I just want to make sure the door is open to get
[Daughter] out.

[FATHER]:           Oh, you want her to see this?  I don't know what else
I'm going to do because I didn't do nothing wrong.

OFFICER BAKER:  You search him yet?

12.

MR. PERRY:        No.

[FATHER]:         I don't have anything.

MR. PERRY:        Lay on your stomach.

[FATHER]:         I am on my stomach.

MR. PERRY:        No, you're not."

## B.    Father's Testimony

Father testified that Perry told him to turn around, and Father then saw Officer Baker approaching. As Officer Baker approached, Father stepped toward a pillar on his porch and put his hands behind his back. Perry got behind Father and pushed Father toward the pillar. Perry stepped toward Father and began shoving Father in between his shoulder blades. Perry told Father to spread his feet and Father complied. Perry applied handcuffs to Father's wrists and Father felt incredible pain as if someone was crushing his left wrist with a vice. Father asked Perry why he was squeezing his wrists and Perry told Father to stop moving. Father testified he was not moving at the times Perry claimed he was. When Father asked Perry whether he was going to keep squeezing the cuffs, Perry yanked on the cuffs, pulling Father backwards and causing Father to spin around. Perry then threw Father head first toward the front door. Father landed on the right side of his face, right shoulder, and right knee on the concrete porch. Perry then smashed Father's head onto the concrete a second time. The officers then rolled him onto his stomach.[7]

---

[7] Extensive testimony was presented regarding Father's medical and mental health concerns following the incident. This evidence was presented in relation to the charge of battery involving serious bodily injury. (§ 243, subd. (d).) Perry was acquitted on this charge. The medical evidence therefore is irrelevant to the issues on appeal and we do not discuss it.

13.

## C.    Neighbor's Testimony

A neighbor who lived directly across the street from Father testified he was getting ready to leave his house when he saw the encounter between Father and the officers through his front screen door.  The neighbor saw Perry approach Father as though he was going to arrest him.  Father was partially behind a pillar on the porch but the neighbor could see Father's hands were behind his back.  The neighbor turned away momentarily and, when he looked back, he saw Perry pick Father up and throw him into the air and onto the ground.  Father's whole body landed on the ground.  The neighbor then saw Perry "ram" Father's head into the concrete while another officer hovered over Father's feet.  Prior to this incident, the neighbor did not know Father and had never spoken to him.

## D.    Perry's Testimony

Perry testified that Father appeared agitated and flustered from the outset of the encounter.  Perry believed he had probable cause to arrest Father for violation of a court order (§ 166, subd. (a)(4)), but he did not immediately do so because he wanted to give Father an opportunity to comply.  Perry eventually radioed for assistance once it became clear he would have to arrest Father.  After Officer Baker arrived, Perry decided to handcuff Father using a "quick cuff" technique.  He put the handcuffs on Father's wrists and adjusted them.  According to Perry, the cuffs went on easily and quickly, but the left cuff went two to three clicks tighter than Perry wanted.  The handcuffs required a handcuff key to loosen them, and Perry explained that inserting the key can be difficult.  Perry inserted the handcuff key to loosen the cuff, but Father was moving during this process, causing the left cuff to go from too tight to too loose.  Perry therefore had to tighten the cuffs a couple of clicks again.  Perry denied he was tightening the cuffs to cause pain.

Perry testified that Father pulled away by stepping and leaning forward and turning right and left.  Perry pulled Father back and, in the process, was stabbed in the

14.

left hand with the cuff key. This caused Perry pain, which caused him to let go of Father. Father started to circle back and square up with Perry so Perry knocked him off balance. Both Father and Perry went to the ground. Perry thought Father was trying to escape.

Once on the ground, Perry pushed Father's left shoulder blade to get him onto his stomach. As soon as Perry let up Father started to roll over again so Perry pushed Father over again.

### E. Officer Baker's Testimony

When Officer Baker arrived on scene, Father was hostile, loud, and yelling. According to Officer Baker, Father did not comply with Perry's directives to turn around, so Perry forced Father to turn around by using a wristlock, which is a pain compliance technique. Perry put the handcuffs on Father and tried to adjust them with the handcuff key. Father was not standing still, making the cuffs more difficult to adjust. Eventually, Father spun all the way around as if he was trying to get away, and Father and Perry both tumbled to the ground. Father landed on his right shoulder and Officer Baker kneeled over his ankles to prevent him from kicking. Perry rolled Father onto his stomach, but Father kept trying to turn over. Perry was bleeding where the handcuff key punctured his hand. Officer Baker eventually got Father onto his stomach, did a cursory search, and adjusted and double locked the handcuffs. Officer Baker did not see Perry lift Father off the ground, throw him to the ground, or slam his head into the ground.

### F. Mother's Testimony

According to Mother, Father appeared angry during the entire encounter. Perry told Father to turn around, but Father refused. Perry tried to handcuff Father, but Father was moving his arms and body. Perry forced Father to turn around and Father went to the ground. Mother did not know whether Father fell or was wrestled or pushed to the ground. Father continued to move and Perry held him down. She did not see Perry slam Father's head into the ground.

15.

### Post-Arrest Conduct

Officer Baker walked Father to his patrol car and drove him to the police department. Once there, Officer Baker briefly left the car and then returned. Father asked him to loosen the cuffs and he did so. Father testified that, while he was sitting in the car with Officer Baker, he recalled having seen Perry a few months earlier, sitting in a restaurant with a woman named Elizabeth, with whom Father had a sexual relationship nine to ten years prior. Father asked Officer Baker whether Perry was married to Elizabeth and Officer Baker said he thought so.

Perry then came to the car. Father asked Perry whether he was married to Elizabeth. According to Father, Perry confirmed he was. According to Perry, Perry did not respond. Perry took Father to another car and drove him to the jail. According to Father, Perry sat Father on the sidewalk at the jail. Father asked, "So this is all because of Elizabeth?" and Perry responded, "Yeah. Payback's a bitch. Karma's a bitch, ain't it?"

Perry testified he is married to Elizabeth. He also testified he was unaware of any contact between Father and Elizabeth until after the arrest, when he left Father at the jail and called his wife.

### Jury Instructions

There is no pattern jury instruction for the offense of assault by a public officer under section 149. Perry's defense counsel submitted proposed instructions, and the court instructed the jury with a modified version of those instructions as follows:

The defendant is charged in Count 1 with Assault by a Peace Officer.

To prove that the defendant is guilty of the crime, The People must prove that:

1. The defendant was a peace officer at the time of the conduct;

2. The defendant was acting under color of authority as a peace officer.

3. The defendant assaulted or beat another person; and

4. The defendant acted without legal necessity.

A peace officer is a public officer.

Color of authority means a person is performing an act that is made possible only because he is clothed with the authority of law, or acting under pretense of law.

Beating another person is synonymous with committing a battery on another person

Both assault and battery are defined in other instructions.

In order to prove that the defendant acted without legal necessity, the People must prove that he used more force than was necessary under the circumstances.

A peace officer may use reasonable force to arrest or detain a person, to prevent escape, or to overcome resistance, when he has reasonable cause to believe that the person has committed a crime. Reasonable cause to believe that a person has committed a crime exists when the facts known to the arresting officer at the time of the arrest would persuade someone of reasonable caution that the person to be arrested has committed a crime. A peace officer may arrest someone if he or she has reasonable cause to make an arrest. Any other arrest is unlawful. In deciding whether the the [*sic*] arrest was unlawful consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she arrested the person. In deciding whether defendant used unreasonable or excessive force, you must determine the amount of force that would have appeared reasonable to a peace officer in defendant's position under the same or similar circumstances. A peace officer who detains or who makes or attempts to make an arrest is not required to retreat or cease from his efforts because of the resistance or threatened resistance of the person being resisted."

The court also instructed the jury on a variety of corollary issues, including when exigent circumstances may permit a police officer to enter a residence without a warrant, when *Miranda*[8] warnings are required, when an officer is excused from the requirement to

---

[8] *Miranda v. Arizona* (1966) 384 U.S. 436.

17.

inform the person being arrested of the authority for and intent to arrest, and all of the offenses defense counsel argued Father could have been arrested for, including violation of a court order (§ 166, subds. (a)(4), (b)(1)), child abduction (§ 277), and resisting a peace officer (§ 148).

### Closing Arguments

The prosecutor argued Perry should have tried calling Father and instructing him to bring Daughter to the police station to effectuate a custody transfer, rather than allowing the estranged parents to confront each other face-to face in a non-neutral location. The prosecutor further claimed Perry violated the custody order by requiring Father to exchange Daughter at his home, rather than the police department or school. Accordingly, the prosecutor argued, Perry was "no longer acting with lawful necessity" after he told Father to "grab [his] daughter" and all of Perry's conduct from that point forward was therefore unlawful: "From this point forward, he's basically a rogue cop, right?" The prosecutor cited a number of Perry's actions that were illegal as a result of this initial illegality: telling Father to turn around, pushing him, telling him to spread his feet, handcuffing him, overtightening the cuffs, throwing Father onto the ground, smashing Father's head into the ground, not informing Father he was under arrest, entering Father's house without a warrant to retrieve Daughter, and not advising Father of his *Miranda* rights.

The prosecutor continued, "The defendant's actions were unlawful because he insisted the child custody exchange take place at a non-neutral, non-public location. Thus, he violated the custody order. There was no necessity in waking up a sick, sleeping child. Objectively speaking, was he acting in the best interest of the child or was he out for personal revenge?" The prosecutor went on to state, "The defendant's actions were unlawful and not necessary. Thus the defendant did not act with lawful necessity. Thus the defendant is guilty of an assault by a police officer or public officer."

In response, defense counsel argued Perry was "only doing … what the law mandated he do – enforce a court order and make sure a 15-year-old girl was safe and unharmed." Defense counsel further argued Perry had a "reasonable, objective basis" for arresting Father for violating a custody order and resisting arrest. Defense counsel described proof beyond a reasonable doubt as being able to "look at yourself in the mirror and say, 'The prosecutor proved beyond a reasonable doubt that Tyson Perry committed a crime when he arrested [Father.]' " She contended Perry did not violate section 149 if he acted with lawful necessity, and if his use of force was "lawful, reasonable, and appropriate." She contended Perry's conduct was reasonable and necessary when he handcuffed Father and took him to the ground. She further argued Perry did not slam Father's head on the ground a second time.

Defense counsel emphasized the jury was required to find Perry's conduct unlawful before it could convict him of assault by a public officer under section 149. Defense counsel contended Perry acted lawfully in each of what she characterized as three phases of the encounter: (1) going to Father's home to retrieve Daughter, (2) arresting Father, and (3) using force against Father. Defense counsel characterized as "trashy," "salacious," and "despicable" the prosecutor's theory that Perry had a motive to use excessive force against Father based on Father's prior relationship with Perry's wife.

In his rebuttal closing, the prosecutor argued Perry was motivated by personal animus and lost his cool. The prosecutor referred to testimony from Perry's lieutenant suggesting a custody dispute generally would be handled through an incident report rather than arrest and argued there was no necessity to throw Father on the ground, bash his face on the concrete, or overtighten the handcuffs when Father complained.

## DISCUSSION

### I.     Theory of Guilt Based on Unlawful Arrest

The jury was presented with two theories upon which it could find Perry guilty of assault by a public officer. The first theory focused on the legality of Perry's contact

19.

with Father:  the prosecutor argued Perry was not empowered to use any force against Father because the visit to Father's home to effectuate a custody transfer and the subsequent arrest were unlawful.  The second theory focused on the reasonableness of the force utilized:  the prosecutor argued the force used in handcuffing Father, taking him to the ground, and hitting his head on the cement was unreasonable and unnecessary.

Perry challenges the first of these theories, contending it was not factually supported.  However, during the pendency of this appeal, the First District Court of Appeal decided *People v. Lewelling* (2017) 16 Cal.App.5th 276 (*Lewelling*), and held that a wrongful arrest, standing alone, does not provide a basis for conviction under section 149.  Thereafter, Perry submitted a supplemental brief, citing *Lewelling* and arguing this theory was also legally invalid.  According to Perry, because of the prosecutor's argument, the court's instructions, and the closeness of the case, it is impossible to determine the jury's verdict necessarily rested on a valid ground and reversal is therefore required.

The Attorney General advances a different interpretation of section 149. According to the Attorney General, section 149 *only* punishes uses of force that are executed without any justification to invoke color of authority or with a vindictive private motive.  Thus, the Attorney General argues, a use of force is not punishable under section 149, even if excessive or unreasonable, so long as the public official properly invoked color of authority.[9]  The Attorney General contends "lawful necessity" existed for Perry to assist in enforcement of the custody order.  As such, the Attorney General contends Perry cannot be prosecuted pursuant to section 149 for any use of force associated with that exercise of police authority, unless the jury finds Perry had a private, vengeful motive.  Because the record does not reflect the jury properly understood this

---

[9] The Attorney General therefore contends *Lewelling* was wrongly decided.

20.

task, the Attorney General agrees reversal is required but contends the matter must be remanded for retrial on a proper legal theory.

The Merced County District Attorney filed a brief as amicus curiae. The District Attorney does not argue the judgment is supportable on a theory Perry lacked lawful authority to contact or arrest Father. Instead, the District Attorney argues the jury was properly instructed and the record is sufficient to conclude the jury based its verdict on a valid legal theory, i.e., that Perry used more force than necessary under the circumstances.

The parties agree Perry had lawful authority to enforce the custody order and the People do not argue Perry lacked lawful authority to arrest Father for its violation. We must decide whether permitting the case to go to the jury on a theory that he lacked such authority constituted legal or factual error, or both. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1126-1127, 1129 (*Guiton*) [holding different standards of review apply depending on whether a theory of guilt is legally or factually insufficient].) We begin with an overview of federal and state law governing uses of force by law enforcement and ultimately conclude section 149 is governed by the same standards as those applied in the Fourth Amendment context. We also agree with *Lewelling* that an unlawful arrest or detention alone is not a legally valid basis for conviction under section 149. We then review the prosecutor's arguments and the court's instructions in this case and conclude they erroneously invited the jury to find Perry violated section 149 by unlawfully arresting Father. We therefore reverse the judgment because the record reveals no basis to conclude the jury necessarily rested its verdict on a valid theory of guilt. However, we find substantial evidence exists to support conviction on a valid theory, i.e., that Perry used more force than would have appeared necessary to a reasonable officer on the scene, and we therefore conclude retrial is permitted.

21.

### A. Law Regarding Police Officer Use of Force

#### 1. Federal Law

The primary limitation on the use of force by law enforcement officers is found in the Fourth Amendment to the United States Constitution, which provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const. 4th Amend.; *Mapp v. Ohio* (1961) 367 U.S. 643 [Fourth Amendment made applicable to the states through the Fourteenth Amendment].) The Fourth Amendment protects the people from arrest without probable cause (*Bailey v. United States* (2013) 568 U.S. 186, 192; *Kaupp v. Texas* (2003) 538 U.S. 626, 630), investigatory detention without reasonable suspicion (*Terry v. Ohio* (1968) 392 U.S. 1, 6-7; *Florida v. Royer* (1983) 460 U.S. 491, 498), and the use of excessive force by law enforcement during the course of either (*Graham v. Connor* (1989) 490 U.S. 386, 395 (*Graham*)).

Federal law recognizes that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." (*Graham, supra,* 490 U.S. at p. 396.[10]) The reasonableness of that

---

[10] Perry contends throughout his briefing that we are bound to apply the standards articulated in *Graham* in this case. *Graham* was a civil rights action brought pursuant to section 1983 of title 42 of the United States Code and it involved an alleged violation of the Fourth Amendment. Long-standing and deeply held principles of federalism counsel that we have no obligation to import those standards into our state law defining criminal offenses. (*People v. Buza* (2018) 4 Cal.5th 658, 684 (*Buza*) ["[I]t remains a basic tenet of our system of federalism that 'the nation as a whole is composed of distinct geographical and political entities bound together by a fundamental federal law but nonetheless independently responsible for safeguarding the rights of their citizens.' "]; *Montana v. Egelhoff* (1996) 518 U.S. 37, 42 [" '[P]reventing and dealing with crime is much more the business of the States than it is of the Federal Government, and ... we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States."].) Although decisions of the United States Supreme Court interpreting

22.

use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (*Ibid.*) The reasonableness inquiry is an objective one: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (*Id.* at p. 397.) In other words, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." (*Ibid.*) The reasonableness test evaluates the totality of the relevant circumstances, which may include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (*Id.* at p. 396.)

A person may sue civilly under federal law for a violation of his or her Fourth Amendment rights by an officer acting under color of state law. (42 U.S.C. § 1983.) Additionally, federal law imposes criminal penalties where the officer's violation of a person's civil rights is willful. (18 U.S.C. § 242.)

### 2. California State Law

The United States Constitution provides the floor, rather than the ceiling, for the protection of individual liberties. Thus, the States are free to enact greater protections than those required by the federal Constitution. (See *Mills v. Rogers* (1982) 457 U.S. 291, 300 ["Within our federal system the substantive rights provided by the Federal Constitution define only a minimum. State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution. [Citation.] If

---

constitutional provisions that parallel our state constitution are "entitled to respectful consideration," those decisions are at most persuasive in interpreting section 149. (See *Buzo, supra,* at p. 684.) Ultimately, it is the state that retains the power to determine what is criminal and what is not. (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 635.) Thus, while we find *Graham* persuasive in this context for reasons we discuss below, it is not binding on our interpretation of section 149.

so, the broader state protections would define the actual substantive rights possessed by a person living within that State."].)  Nevertheless, California has generally adopted Fourth Amendment jurisprudence for interpreting analogous provisions of the California Constitution.  (See *Buza, supra,* 4 Cal.5th at pp. 685-686; *People v. Celis* (2004) 33 Cal.4th 667, 673 [interpreting probable cause for purposes of arrest and reasonable suspicion for purposes of detention]; see also *People v. Camacho* (2000) 23 Cal.4th 824, 830 [application of exclusionary rule]; Cal. Const., art I, § 13.)  Our courts therefore apply federal legal standards when analyzing the reasonableness of a search or seizure under California constitutional law.

In addition to the California Constitution, California statutes govern police officer uses of force.  A police officer is permitted to use "reasonable force" to effectuate an arrest, to prevent escape, or to overcome resistance if the officer "has reasonable cause to believe that the person to be arrested has committed a public offense."  (§ 835a.)  An officer who uses unreasonable force could be sued civilly for the violation.  (Gov. Code, § 820 [public employees statutorily liable to the same extent as private persons for injuries caused by their acts or omissions]; *Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 512-517 (*Hernandez*); *Edson v. City of Anaheim* (1998) 63 Cal.App.4th 1269, 1272, 1274.)  An officer who arrests or detains a person "without a regular process or other lawful authority" may be criminally prosecuted for violation of section 146, a misdemeanor.  (§ 146, subd. (a).)  Additionally, section 149, the statute at issue in this case, applies criminal penalties for an officer's use of force "without lawful necessity."[11] (§ 149.)

---

[11] "Every public officer who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in a county jail not exceeding one year, or pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment."  (§ 149.)

Although enacted in 1872, section 149 has been the subject of relatively limited decisional law. There is, however, seeming consensus that "without lawful necessity" means "more force than was necessary under the circumstances." (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1140 (*Mehserle*); *Lewelling, supra,* 16 Cal.App.5th at p. 297.) This interpretation is effectively shorthand for the standard applied in cases alleging excessive force in violation of the Fourth Amendment. (See *Graham, supra,* 490 U.S. at pp. 396-397 [reasonableness inquiry makes allowance for officers making "split-second judgments … about the amount of force that is necessary in a particular situation"]; *United States v. Reese* (9th Cir. 1993) 2 F.3d 870, 885 [endorsing instruction that described unreasonable force under *Graham* as "more force than is necessary under the circumstances"]; see *Ne Casek v. City of Los Angeles* (1965) 233 Cal.App.2d 131, 137 [describing section 149 as imposing liability for the use of excessive force].)

We agree this standard, encompassing the Fourth Amendment standard of reasonable necessity, appropriately governs section 149. The plain language of section 149 itself suggests this result. (*People v. Scott* (2014) 58 Cal.4th 1415, 1421 [" ' "We begin by examining the statute's words, giving them a plain and commonsense meaning." ' ".].) The words "lawful" and "necessity" are not fraught with ambiguity. "Lawful" means "permitted or recognized by law." (Black's Law Dictionary (10th ed. 2014).) "Necessity" means "[s]omething that must be done or accomplished for any one of various reasons." (*Ibid.*) Taken together, these words suggest section 149 punishes uses of force that exceed what is reasonably required for the accomplishment of a recognized, lawful purpose. This is the same type of force proscribed by the Fourth Amendment. (*Graham, supra,* 490 U.S. at pp. 396-397.) There is no meaningful distinction between force that is not reasonably required under the circumstances (*ibid.*), and force "without lawful necessity" (§ 149).

Based on the foregoing, we reject the Attorney General's argument that section 149 applies only when an officer lacks facial justification for invoking law

25.

enforcement authority.[12]  Under the Attorney General's view of section 149, an officer who has a lawful basis for arrest or detention could not be prosecuted under the statute, regardless of the degree of or necessity for the force used.  There is no logical or textual basis for this interpretation, which effectively replaces the requirement that the officer used force "without lawful necessity" with a requirement the officer used force "without lawful authority."[13]  The Attorney General also complains that our interpretation of section 149 would subject the "least attempted touching" by an officer to prosecution.  However, this is so only where a reasonable officer in the same circumstances would find the least threatened touching objectively unreasonable.  The qualifier of "lawful necessity" is sufficient to differentiate between uses of force that violate the statute and those that do not.

### 3.     Overlap of Unlawful Arrest and Use of Force Claims

The law is somewhat unsettled when it comes to the standards governing an officer's use of force in the context of an arrest that is, itself, alleged to be unlawful.

Federal courts of appeal that have considered the issue unanimously agree that a lack of probable cause for arrest does not establish a *per se* use of excessive force under the Fourth Amendment.  (See *Velazquez v. City of Long Beach* (9th Cir. 2015) 793 F.3d 1010, 1024 & fn. 13 (*Velazquez*) [collecting cases].)  These courts have therefore rejected

---

[12] As an example, the Attorney General explains an officer could be prosecuted for "ordering persons standing in line to disperse at a betting counter, just so he could place a personal bet himself."

[13] The Legislature used the phrase "without … lawful authority" in section 146, which relates to unlawful arrest, and we presume the Legislature intended to use different language in section 149.  (See *Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 343 [" '[W]hen different words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended.' "]; *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141 [" '[W]e consider the language of the entire scheme and related statutes, harmonizing the terms when possible.' "]; *Lewelling, supra,* 16 Cal.App.5th at p. 298 [holding that section 146 and section 149 criminalize different conduct].)

claims that assert *any* use of force is excessive if the arrest is unlawful. (*Ibid.*) However, the Ninth Circuit Court of Appeals has held the circumstances surrounding an unlawful seizure may be pertinent to the evaluation of the reasonableness of an officer's use of force because, pursuant to *Graham, supra,* 490 U.S. at pp. 394-397, an excessive force claim under the Fourth Amendment is ultimately a challenge to the "overall reasonableness of the seizure":

> "*Graham* specifies 'the severity of the crime at issue' as one of the factors to be considered, and stresses the need to attend to the specific 'facts and circumstances of each particular case.' [Citation.] Conducting this fact-based inquiry encompasses a consideration of the facts known to the police officers at the time. [Citation.] Where officers are presented with circumstances indicating that no crime was committed, the 'severity of the crime at issue' factor is necessarily diminished as a justification for the use of force—although, as our cases have held, the force used may still be reasonable if the other *Graham* factors taken together favor that conclusion." (*Velazquez, supra,* 793 F.3d at p. 1025; see *Jones v. Parmley* (2d. Cir. 2006) 465 F.3d 46, 62 ["[T]he reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest."].)

Thus, the Ninth Circuit has concluded "the facts that gave rise to an unlawful detention or arrest can factor into the determination whether the force used to make the arrest was excessive." (*Velazquez, supra,* 793 F.3d at p. 1024.)

The Tenth Circuit Court of Appeals has taken a more limited view of the relevance of an unlawful arrest or detention to an excessive force claim:

> "[T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case. Thus, in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force." (*Cortez v. McCauley* (10th Cir. 2007) 478 F.3d 1108, 1126 (*Cortez*).)

27.

Under this rationale, an officer's use of force is evaluated under the same standard, regardless of whether or not the arrest was lawful: whether the officer used more force than would have been reasonably necessary to effectuate a lawful arrest. (*Cortez, supra,* 478 F.3d at p. 1127.)

In *Lewelling, supra,* 16 Cal.App.5th at pp. 296-300, California's First District Court of Appeal considered the overlap between unlawful detention and excessive force in the context of section 149, the statute at issue in the instant case. Specifically, the court considered whether the trial court correctly instructed the jury that the "without lawful necessity" element of section 149 was defined in a separate instruction concerning an officer's lawful performance of his duties. When combined, those instructions informed the jury the "without lawful necessity" element could be met by proof that the officer *either* was unlawfully arresting or detaining someone, *or* using unreasonable or excessive force when making an otherwise lawful arrest or detention. (*Lewelling* at p. 297.)

According to the court, that directive permitted the prosecutor to satisfy this element "simply by proving that defendant carried out an unlawful detention." (*Lewelling, supra,* 16 Cal.App.5th at p. 297.) The court reviewed the language of section 149 and related statutes and concluded this directive was erroneous. In other words, the *Lewelling* court, like the federal courts, concluded an officer cannot be found to have used force "without lawful necessity" simply by wrongfully arresting or detaining someone.[14] (*Id.* at p. 296; see *Velazquez, supra,* 793 F.3d at p. 1024 & fn. 13; see *People v. Dukes* (1928) 90 Cal.App. 657, 661–662 [unlawful arrest, standing alone, is insufficient to support conviction under section 149].)

---

[14] *Lewelling* did not address whether the circumstances surrounding an unlawful arrest or detention may be considered as part of the totality of the circumstances in evaluating the lawful necessity of an officer's use of force, and we need not resolve that question here because it is undisputed on appeal that Perry had lawful authority to arrest Father.

We agree with *Lewelling* that the elements of section 149 are not satisfied simply by establishing an unlawful arrest or detention.[15]  As explained above, the proper focus under section 149 is the reasonable necessity for the degree of force used.  Section 149 applies when an officer "without lawful necessity, assault or beats any person."  (§ 149.)  The plain language requires that the assault or battery lack lawful necessity, not the arrest or detention.  It may be that the context of a particular arrest is such that no reasonable officer would have considered *any* use of force reasonably necessary.  However, this determination must be made in consideration of the totality of the circumstances.  (See *Mehserle, supra,* 206 Cal.App.4th at p. 1140 [evidence that unarmed victim was fatally shot after he surrendered and was not a threat was sufficient for jury to conclude officer acted without lawful necessity]; see also *Graham, supra,* 490 U.S. at p. 396.)  To hold otherwise, that an unlawful arrest constitutes a *per se* violation of section 149, ignores "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  (*Graham, supra,* 490 U.S. at p. 397.)  It also would convert a prosecution for excessive force into a prosecution for unlawful arrest, which violation is already adequately addressed by section 146.

### 4.    Application to the Facts of This Case

With these principles in mind, we turn to the facts of the instant case.  Perry contends the trial court erroneously instructed the jury it could find Perry violated section 149 solely on the basis Perry did not have probable cause to arrest Father.  We agree the instructions erroneously suggested this result.

---

[15] Perry challenges section 149 as unconstitutionally vague, but concedes that interpreting section 149 to comport with both *Graham* and *Lewelling* would resolve this concern.  Accordingly, in light of our holding, we do not address the vagueness challenge.

29.

The jury was properly informed it was required to find beyond a reasonable doubt that Perry acted without legal necessity.  The instructions also properly stated, "In order to prove that the defendant acted without legal necessity, the People must prove that he used more force than was necessary under the circumstances" and informed the jury this was to be determined from the perspective of a reasonable peace officer in the same or similar circumstances.

However, the instructions also explained an officer can use reasonable force to arrest a person when he has reasonable cause to believe the person has committed a crime, and "may arrest someone if he or she has reasonable cause to make an arrest," but that "[a]ny other arrest is unlawful."  The instructions then encouraged the jury to determine whether the arrest was unlawful:  "In deciding whether the the [*sic*] arrest was unlawful consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she arrested the person."  Together, these instructions suggest an arrest without reasonable cause is unlawful and the use of force in such arrest is therefore "without legal necessity."  As explained above, this inference is erroneous.[16]  Instructing the jury that an officer is authorized to use force in arresting or detaining a person, or to prevent escape or overcome resistance, provided the jury with relevant context regarding the circumstances in which an officer is authorized to use force.  (§ 835a.)  Encouraging the jury to resolve whether the arrest was unlawful likely misled the jury to believe resolution of this issue would be dispositive of Perry's guilt.

---

[16] The misleading instructions were requested by Perry's defense counsel, who asserted "the right to use reasonable force flows from" the right to make an arrest supported by probable cause and that the jury would be charged with "deciding whether Mr. Perry had the probable cause to arrest [Father]."  However, the People do not argue forfeiture or invited error and, in any event, the court was required to properly instruct the jury on the elements of the offense.  (*People v. Merritt* (2017) 2 Cal.5th 819, 824.)  We therefore reach the issue on the merits.

When a jury is presented with alternate theories of guilt, one of which is contrary to law, reversal is required unless there is a basis to conclude the verdict actually was based on a valid ground. (*Guiton, supra,* 4 Cal.4th at p. 1129.) In other words, we presume the error affected the judgment. (*In re Martinez* (2017) 3 Cal.5th 1216, 1224.) This is because " '[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law – whether, for example, the action ... fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.' " (*Guiton, supra,* 4 Cal.4th at p. 1125, quoting *Griffin v. United States* (1991) 502 U.S. 46, 59.) We therefore will reverse if we are " ' "unable to determine which of the prosecution's theories served as the basis for the jury's verdict." ' " (*Guiton, supra,* at p. 1130.)

Here, we cannot conclude the verdict was based on a valid ground. We acknowledge the jury was instructed it could find Perry guilty upon proof he used more force than necessary under the circumstances and counsel for the defense and prosecution presented some argument regarding the degree of force used. However, nothing in the verdict form reveals the theory upon which the jury's finding of guilt was based. The jury requested to re-hear the testimony from Officer Baker and Perry regarding the "takedown" and the period between Father being handcuffed and going to the ground, suggesting the jury may have been concerned about the necessity of this conduct. However, the import of these requests is far from clear and, standing alone, they are not sufficient for us to conclude the verdict actually was based on a valid ground. (*Guiton, supra,* 4 Cal.4th at p. 1129.) To the contrary, the primary focus of the evidence, argument, and instructions was the invalid theory that Perry could be found guilty solely upon proof he unlawfully arrested Father. Reversal is required.[17]

_____

[17] The parties dispute whether retrial would be permitted under the Attorney General's interpretation of section 149, which would criminalize only uses of force

## II.  Refusal to Instruct on *Graham* Factors

Perry challenges the court's refusal to give a jury instruction outlining factors that bear on the reasonableness of an officer's use of force, as set out in *Graham, supra,* 490 U.S. at p. 396. Because we reverse on other grounds, we need not resolve whether the court's refusal constituted error or was prejudicial to Perry. However, we briefly address the proposed instruction for purposes of giving guidance on remand.

The proposed instruction would have informed the jury, "You should consider, among other factors, the following: [¶] a. The seriousness of the crime at issue; [¶] b. Whether [Father] reasonably appeared to pose an immediate threat to the safety of defendant Perry or others; and [¶] c. Whether [Father] was actively resisting arrest or attempting to evade arrest."

These factors derive directly from *Graham, supra,* 490 U.S. at 396. They also are included in California's civil jury instructions for battery on a peace officer. (CACI No. 1305; see *Hernandez, supra,* 46 Cal.4th at pp. 512-517 [approving Fourth Amendment reasonableness standard for California negligence claims involving use of force].) Additionally, all three factors were at issue in this case: the prosecutor argued it was unnecessary for Perry to arrest Father, and that Father was not threatening anyone or resisting arrest. The proposed instruction is an accurate statement of the law and supported by the facts of the case.[18]

---

during arrests or detention motivated by vengeance and executed without lawful authority. However, we have rejected the Attorney General's interpretation. The evidence is sufficient to permit retrial on the theory that Perry used more force than was reasonably necessary under the circumstances.

[18] We note, however, that *Graham* counsels the reasonableness test is not capable of precise definition or mechanical application, and the reasonableness of the seizure must be assessed with regard to the totality of the circumstances confronting the arresting officer. (*Graham, supra,* 490 U.S. at pp. 396-397.) Thus, these factors may not be an appropriate subject of instruction in every case.

## III. Motive Evidence

Perry contends the trial court erred in admitting evidence of motive. We address this issue to provide guidance on remand.

Under *Graham*, motive or ill intentions are irrelevant to the determination of whether an officer's use of force was reasonable because the inquiry is an objective one. (*Graham, supra,* 490 U.S. at p. 397.) However, in criminal cases, evidence of motive is generally relevant because it " 'makes the crime understandable and renders the inferences regarding defendant's intent more reasonable.' " (*People v. Riccardi* (2012) 54 Cal.4th 758, 815, abrogated on another point by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

In this case, the jury was presented with competing factual scenarios. In Father's version of the events, Father was physically compliant (if verbally confrontational), but Perry repeatedly overtightened the handcuffs, threw Father to the ground, and smashed his head on the ground a second time. In Perry's version of the events, Father was physically non-compliant, causing the handcuffs to overtighten and requiring Perry to sweep Father to the ground for safety purposes. Perry denied ever smashing Father's head on the ground a second time.

In determining which version of these events was more credible, the jury was entitled to consider whether Perry had any ill motive in confronting Father. Such motive, if believed, could make more understandable an inference that Perry engaged in the conduct Father described.

Concern that the jury may improperly consider motive in determining the reasonableness of the force used may be resolved by way of a limiting instruction. We leave it to the parties and the court to craft such an instruction on remand, if necessary.

**DISPOSITION**

The judgment is reversed.

_____
SNAUFFER, J.

WE CONCUR:


_____
DETJEN, Acting P.J.


_____
DE SANTOS, J.