Filed 1/27/21  P. v. Tibayan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C089713 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE020202) |
| v. | |
| BRIANNA LOUISE TIBAYAN, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Brianna Louise Tibayan was found guilty of carjacking.  Additionally, the trial court found true allegations that she had been previously convicted of a serious felony and a prior serious or violent felony (a "strike").  The court imposed an aggregate term of 15 years in state prison.  On appeal, defendant contends:  (1) she received ineffective assistance of counsel because her counsel failed to object to admission of a text message where defendant said she was "a young female gangsta new generation"; (2) she received ineffective assistance of counsel because her

1

counsel failed to object to the admission of defendant's text messages as adoptive admissions; and (3) these errors resulted in cumulative prejudice. We will affirm.

## I. BACKGROUND

On June 18, 2017, L.M. got a car ride with defendant and defendant's girlfriend from Sacramento to Modesto so that L.M. could pick up her personal items from a residence in Modesto from which she was moving. This was the first time L.M. had ever met defendant, who L.M. knew as "Nena." The ride had been set up by L.M.'s sister-in-law, Lydia, and defendant's cousin, and Lydia paid defendant $60 and also filled up her car with gas. When L.M., defendant, and defendant's girlfriend arrived in Modesto, they retrieved L.M.'s personal items from the residence where she had been staying and loaded the items into three vehicles: defendant's vehicle, L.M.'s Ford Explorer, and L.M.'s Oldsmobile Cutlass Supreme. They exchanged phone numbers. Defendant drove L.M.'s Oldsmobile, L.M. drove the Explorer, and defendant's girlfriend drove defendant's vehicle.

On the way back to Sacramento from Modesto, defendant and defendant's girlfriend drove their vehicles ahead of L.M. to the point where L.M. could no longer see the other two vehicles on the highway. L.M. panicked and called defendant's phone, but there was no answer. L.M. eventually made it back to the residence of her friend, Amy, who lived in Sacramento on Peacock Way. She called defendant's cousin and told him where the others could meet L.M., and defendant and her girlfriend arrived in the other two vehicles shortly thereafter. L.M. unpacked her own items out of defendant's vehicle. The trunk of defendant's car was not opened, and L.M. thought that defendant's girlfriend had already pulled L.M.'s items out of the trunk. Before leaving, defendant asked L.M. about buying her Oldsmobile for $400. L.M. replied that the car was not for sale but she would call defendant if she changed her mind.

Within a few hours after defendant left, she sent a text message to L.M. stating that L.M. had left some bags in her car. L.M. called defendant and defendant told L.M.

2

to come to defendant's location to pick up her remaining items and told her to drive the Oldsmobile. L.M. said she could not drive to defendant's location because the Oldsmobile had expired registration tags and L.M.'s Ford Explorer had a leaking radiator. Defendant said she would deliver the items to L.M. if she paid her money for gas, which L.M. agreed to do.

At some point, defendant arrived at Amy's house and sent a text message to L.M. stating, "I'm outside." L.M. went outside and defendant had already set L.M.'s items on the sidewalk or curb. Defendant arrived in a Chevy Impala, or something like it, with a male. L.M. thanked defendant for bringing her items and gave her $15 for gas. Defendant told L.M. that she had left her identification in L.M.'s Oldsmobile. L.M. bent over, looking around the car seat and floorboard for the identification when defendant said, " 'Nah, nah. Turn around.' " L.M. backed out of the car and noticed that defendant was pointing a chrome revolver at her from about 15 feet away. Defendant said, " 'Give me your keys, bitch, before I shoot you.' " L.M. replied, " 'You don't want to do this.' " The male with defendant never got out of defendant's car, but he said, " 'You better give her the keys before she shoots you.' " Defendant then said, " 'You better give me your keys, bitch, before I shoot you.' " Defendant raised her gun in the air and fired. L.M. threw defendant the keys to the Oldsmobile and ran to the back of the house. When L.M. checked later, the Oldsmobile and defendant's vehicle were gone.

Shortly after the incident, Amy called 911. During the call, L.M. told the 911 operator/dispatcher, "Yes. My car was just taken at gunpoint right now." L.M. described the vehicle in part as "a beige Cutlass Supreme Oldsmobile." When the 911 operator/dispatcher asked L.M. if she knew who took her vehicle, L.M. replied, "Yeah, yeah, they, well I don't really know them, I met them today. Uh, I know where they go, they know some of the people that I was at my - - at this house. They know some of the people that I know, they know them. They [helped] me move some stuff from Modesto over here to Sacramento." L.M. described the perpetrators as "a girl and a guy."

3

According to L.M., the female was about 30 to 35 years old with a hat on backwards and a ponytail and had shot a chrome gun once in the air. L.M. knew the female as "Nena" and that defendant had a cousin named "Conrad." L.M. explained to the 911 operator/dispatcher that her cousin arranged a ride from defendant.

That evening, one of Amy's neighbors, Nicholas, heard what he thought was either a gunshot, a car door slamming, or a firework. After hearing the noise, which was loud enough to draw his attention to get out of bed and look, he saw a beige sedan similar to an Oldsmobile, and a smaller compact car, traveling away from the area in opposite directions at the same time. When he spoke with the police that same evening, he told an officer he thought he had heard a gunshot.

Three days after defendant took L.M.'s car, L.M. and defendant exchanged a series of text messages. Initially, L.M. texted defendant to "[j]ust give me my car back and let all this be done and over." L.M. also texted defendant, "I want my car back the same way you took it. I know what it has outside and inside." Defendant responded back with a text message, "Bitch u call no shots first off second off I'm not worried about your people n second off I fuckkkk with a lot of people n third don't hit my shit calling shots n fourth!!!!i know where each one of these people u so called love are Conrad nor your brother or sisters have a thing to do w it!!!u might just make the situation worse for YOUR loved ones n folks!!!u think Ima sucka does it sound or look like I would play expecially now u got police involved or these young ass people involved!" L.M. texted defendant that she just wanted her car back and wanted to know what defendant wanted. Defendant texted L.M., "Because you payed with your pride boxing shit doesn't mean a damn thing" and "I want you to learn how to talk to people I want you to learn respect others and never take this shit for granted I want you to appreciate muthafukkkkas who go out there way to help you I owe you nothing! your right it's between u n I your an og and know how this shit goes!dont take people for someone you can get over or run all over people." Defendant sent the following series of text messages, "Depends on how I

4

feel because right now!!! your having people acting hard calling people who don't have nothing to do w it!!!and police"; "Lol"; "Your joking right"; "I want 3000 u can buy my car! I have all that it needs registration"; "Snitching!!!!! is a no go"; and, "Your people who keep trying to get involved will end now calling your brother n your so called kids n my cousin gotta stop." L.M. replied, "You stole my car , call it what you want.  I not paying for a car you car jack at gun point." Defendant replied, "Hope your lesson was taught bitch ima a young female gangsta new generation go get your shit call your Lydia she'll tell u."

Lydia testified at trial that, within possibly a few days of June 18, 2017, she texted defendant from Conrad's phone asking defendant to give up "the car." She believed defendant responded that she would bring the car back because Conrad told her he would bring it back, but Lydia did not see that communication from defendant. On June 22, 2017, L.M. found her Oldsmobile in a parking lot north of Elkhorn Boulevard. The vehicle was in moderate to good condition and was valued at roughly $4,000 to $5,000. Items were missing from the Oldsmobile such as blankets, speakers, pictures, and paperwork.

Detective Brian Murawski spoke with defendant. She admitted that she knew L.M. Defendant denied carjacking L.M. or offering to buy L.M.'s car. Defendant felt that L.M. was setting her up. Defendant asked the detective repeatedly, "Does she have her car?" At the time of the interview, the Oldsmobile had already been released back to L.M.

Phone records for defendant's phone number showed that on June 18, 2017, defendant's phone was in Sacramento at 11:18 a.m. At 2:02 p.m., the phone moved to Salida, which is north of Modesto. At 6:05 p.m., defendant's phone moved north along the Highway 99 corridor in the Stockton area. At 6:47 p.m., defendant's phone was in the South Sacramento area. At 7:01 p.m. defendant's phone was within the coverage area for Amy's home on Peacock Way. At 7:27 p.m., defendant's phone moved north along

5

the Interstate 5 corridor.  At 9:25 p.m. defendant's phone was just south of the interchange between Interstate 80 and Interstate 5.  At 9:49 p.m. defendant's phone was near South Sacramento, specifically within the coverage for Amy's home on Peacock Way.  At 10:11 p.m., defendant's phone moved north along the Interstate 5 corridor toward Interstate 80.

Defendant was charged with one count of carjacking (Pen. Code, § 215, subd. (a)—count one)[1] and one count of felon in possession of a firearm (§ 29800, subd. (a)(1)—count two).  It was further alleged, in association with count one, that defendant personally used a firearm within the meaning of both sections 12022.53, subdivision (b), and 12022.5, subdivision (a).  It was also alleged that, during the commission of count one, defendant personally discharged a firearm within the meaning of section 12022.53, subdivision (c).  It was further alleged that defendant had been previously convicted of a serious felony within the meaning of section 667, subdivision (a), and a prior serious or violent felony (a "strike") within the meaning of sections 1170.12 and 667, subdivisions (b)-(i).

During motions in limine prior to the jury trial, the trial court granted defendant's motion to bifurcate the prior conviction allegations and defendant waived her right to a jury trial on those allegations.  The jury found defendant guilty on count one, but not guilty on count two.  Additionally, the jury found that the firearm allegations associated with count one were not true.  Subsequently, after a court trial, the trial court found the prior conviction allegations to be true.

The trial court sentenced defendant to an aggregate prison term of 15 years, as follows:  the middle term of five years for the carjacking, doubled to 10 years because of the prior strike, plus five years for the prior serious felony enhancement.

---

[1]  Undesignated statutory references are to the Penal Code.

Defendant filed a timely notice of appeal.

## II. DISCUSSION

### A. *Ineffective Assistance of Counsel*

Defendant contends her counsel was ineffective in failing to object to admission of a text message where defendant said she was "a young female gangsta new generation" and failing to object to the admission of defendant's text messages as adoptive admissions. We disagree.

To establish ineffective assistance, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218; *Strickland v. Washington* (1984) 466 U.S. 668, 687-692 [80 L.Ed.2d 674, 693-696].)

In measuring counsel's performance, judicial review is highly deferential. (*Strickland v. Washington, supra*, 466 U.S. at p. 689; *In re Andrews* (2002) 28 Cal.4th 1234, 1253.) "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) When the strategic reasons for challenged decisions are not apparent from the record, we will not find ineffective assistance of counsel unless there could have been " ' "no conceivable tactical purpose" ' " for counsel's acts or omissions. (*People v. Earp* (1999) 20 Cal.4th 826, 896; see also *People v. Arce* (2014) 226 Cal.App.4th 924, 930-931.)

### 1. *Failure to Object to Admission of the "Gangsta" Text Message*

Defendant argues she suffered ineffective assistance of counsel because her counsel failed to object to her text message to L.M. describing herself as "a young female gangsta new generation," describing it as evidence that defendant admitted to being a

7

gang member in a case that did not involve gang-related crimes or enhancements. The People contend that any objection would have been futile and defendant was not prejudiced because the evidence in question did not constitute "gang evidence." We agree.

We conclude that defendant's argument is without merit. First, we question defendant's characterization of this message as "gang evidence." The "gangsta" text message was the only reference of its kind throughout the evidentiary portion of the trial. Without any additional evidence about defendant participating in a gang, her comment does not appear to be a clear admission of gang membership but rather, bragging in a colloquial manner about her toughness. In contrast to the cases defendant cites, there was no evidence presented at trial that defendant was involved in a criminal street gang.

Second, regardless of whether the text message constituted "gang evidence," because there is no strategic reason apparent from the record for why defense counsel did not object to these text messages, we may only reverse if there was no conceivable tactical reason for counsel's failure to object. (*People v. Earp, supra*, 20 Cal.4th at p. 896.) Defense counsel's performance is not constitutionally deficient for failing to make a meritless or futile objection. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463 [counsel was not under a duty to make a meritless or futile objection].) The text message in question was admissible to prove a motive for defendant's conduct because it tends to show she felt disrespected and was angry with L.M. (See *People v. Perry* (2019) 36 Cal.App.5th 444, 473 ["in criminal cases, evidence of motive is generally relevant because it ' "make[s] the crime understandable and renders the inferences regarding defendant's intent more reasonable" ' "]; see also *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 [gang evidence is admissible when it "is relevant to an issue of motive or intent"].) The prosecutor argued that one of defendant's motives to carjack L.M. was to gain respect. Accordingly, the challenged "gangsta" text message was relevant to help demonstrate defendant's motive for committing the carjacking. Additionally, the

probative value of the "gangsta" text message was not substantially outweighed by the probability of undue prejudice. (See *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 [" '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence' "].) The "gangsta" reference was isolated and unconnected to any other gang-related evidence, and it is not likely the jury would have reasonably understood that the message indicated defendant's gang affiliation or membership.

Defendant's claim is without merit, invalidating her ineffective assistance of counsel claim on this issue. (*People v. Kipp* (1998) 18 Cal.4th 349, 377 [reasoning that counsel's failure to assert a meritless position does not demonstrate ineffective assistance of counsel].)

2. *Failure to Object to Admission of Text Messages as Adoptive Admissions*

Defendant contends that her counsel was ineffective in failing to object to the admission of defendant's text messages because the messages were inadmissible as adoptive admissions. In motions in limine filed by the People, the prosecutor requested, pursuant to Evidence Code section 1220, to introduce pretrial statements made by defendant, which included her text messages with L.M. Defense counsel did not object to the admission of the text messages. At trial, text messages between defendant and L.M. were presented and admitted without objection. During the prosecution's closing argument, the prosecutor noted that when L.M. accused defendant in text messages of stealing or carjacking L.M.'s car, defendant did not directly deny such accusations. There was no objection to this argument.

We conclude defendant's ineffective assistance claim fails because she has not established prejudice. Even assuming that counsel was deficient in failing to object to the admission of the text messages that could be characterized as adoptive admissions, most of the incriminating text messages were simply party admissions that were admissible

9

under Evidence Code section 1220. Defendant does not dispute that most of her own text messages were party admissions and concedes in her reply brief that she is only challenging L.M.'s text messages referenced by the prosecutor pursuant to Evidence Code section 1221, which permits admission of "a statement by someone other than the defendant" when offered to show that the defendant did not deny the statement. (*People v. Davis* (2005) 36 Cal.4th 510, 535.)

The alleged deficiency in counsel's performance in failing to object to a few of the text messages on this narrow basis was harmless because there was strong evidence of defendant's guilt for the carjacking charge. First, L.M.'s trial testimony was supported by a 911 call in which L.M. frantically conveyed to the 911 operator/dispatcher shortly after the carjacking that "Nena" had carjacked her and that Nena had a cousin named "Conrad." Second, it was undisputed that defendant was known as "Nena" and that she had a cousin named "Conrad." Third, on the evening of the carjacking, one of the neighbors in the area of the carjacking corroborated L.M.'s statement that a gun was used during the carjacking of her Oldsmobile and saw two vehicles, one that looked like an old Oldsmobile, speeding away. Fourth, within possibly a few days of June 18, 2017, Lydia V. texted defendant from Conrad's phone asking defendant to give up "the car" and defendant communicated to Conrad that she would bring it back. Fifth, phone records for defendant's phone number show that her phone was in the area of the carjacking at around 7:01 p.m. and that it moved toward north Sacramento after that.

The phone records further showed that at 9:49 p.m., defendant's phone returned to the area of the carjacking on the date in question and that after that it moved north along the Interstate 5 corridor toward Interstate 80. The movement of defendant's phone corroborates L.M.'s testimony and timeline, and defendant's text message to L.M. stating, "I'm outside," corroborates the fact that defendant returned to Peacock Way shortly before the 911 call reporting the carjacking. Finally, defendant sent the following series of text messages which were properly admitted as party admissions under Evidence

10

Code section 1220: "Depends on how I feel because right now!!! your having people acting hard calling people who don't have nothing to do w it!!!and police"; "Lol"; "Your joking right"; "I want 3000 u can buy my car! I have all that it needs registration"; "Snitching!!!!! is a no go"; and, "Your people who keep trying to get involved will end now calling your brother n your so called kids n my cousin gotta stop." These messages are evidence that defendant was angry at L.M. for "snitching" to the police and offered to sell her the car for $3,000. Defendant also sent L.M. the following text message, a party admission, "Bitch u call no shots first off second off I'm not worried about your people n second off I fuckkkk with a lot of people n third don't hit my shit calling shots n fourth!!!!i know where each one of these people u so called love are Conrad nor your brother or sisters have a thing to do w it!!!u might just make the situation worse for YOUR loved ones n folks!!!u think Ima sucka does it sound or look like I would play expecially now u got police involved or these young ass people involved!" A reasonable jury could have construed that message as a threat in retaliation to L.M. for reporting the theft to police and various family members.

Cumulative with L.M.'s testimony, the foregoing evidence strongly supported the jury's finding of defendant's guilt of the carjacking charge. On this record, it is not reasonably probable that a more favorable result would have been obtained if defense counsel had objected. Accordingly, she has not demonstrated prejudice and we must reject her claim she received ineffective assistance of counsel.

B.      *Cumulative Error*

Defendant argues that cumulative error requires reversal. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Having rejected all of defendant's claims of error, "we discern no prejudice—singly or cumulatively—that warrants reversal." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 388.)

11

## III.  DISPOSITION

The judgment is affirmed.

/S/

RENNER, J.

We concur:

/S/

HOCH, Acting P. J.

/S/

KRAUSE, J.